Nos. 20-17363, 20-17364, 21-15193, 21-15194

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

DAVID WIT, et al.,

*Plaintiffs-Appellees,*

v.

UNITED BEHAVIORAL HEALTH,

*Defendant-Appellant.*

GARY ALEXANDER, et al.,

*Plaintiffs-Appellees,*

v.

UNITED BEHAVIORAL HEALTH,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
Nos. 3:14-cv-2346, 3:14-cv-5337 | Hon. Joseph C. Spero

### DEFENDANT-APPELLANT'S OPENING BRIEF

Jennifer S. Romano
Andrew Holmer
CROWELL & MORING LLP
515 South Flower Street, 40th Floor
Los Angeles, CA 90071
(213) 622-4750

April N. Ross
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 624-2500

Miguel A. Estrada
*Counsel of Record*
Geoffrey M. Sigler
Lucas C. Townsend
Matthew S. Rozen
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
MEstrada@gibsondunn.com

*Attorneys for Defendant-Appellant United Behavioral Health*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel state that:

1. United Behavioral Health is a wholly owned subsidiary of OptumHealth Holdings, LLC.

2. OptumHealth Holdings, LLC is a wholly owned subsidiary of Optum, Inc.

3. Optum, Inc. is a wholly owned subsidiary of United HealthCare Services, Inc.

4. United HealthCare Services, Inc. is a wholly owned subsidiary of UnitedHealth Group Incorporated.

5. UnitedHealth Group Incorporated, a publicly held corporation, does not have a parent corporation, nor does any publicly held corporation own 10% or more of UnitedHealth Group Incorporated's stock.

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................1

JURISDICTIONAL STATEMENT ........................................................4

ISSUES PRESENTED............................................................................5

STATUTORY PROVISIONS AND RULES..........................................5

STATEMENT OF THE CASE...............................................................5

I.    ERISA's Comprehensive Scheme Governs Benefit Plans And
Provides Specific Remedies ........................................................5

II.   UBH Uses Clinical Guidelines To Facilitate Its Discretionary
Review Of Mental Health And Substance Use Disorder Coverage
Under Thousands Of ERISA Plans ............................................8

III.  Plaintiffs Challenged 67,000 Coverage Determinations Citing
Hundreds Of UBH's Guidelines................................................11

IV.  Plaintiffs Framed Their Claim As A "Facial" Challenge Based On
A "Procedural" Injury...............................................................13

V.   The District Court Granted Classwide Relief .........................15

    A.   The Court Accepted Plaintiffs' "Procedural Harm" Theory And
Certified A Class Action .....................................................15

    B.   The Court Limited Its Deference To UBH And Found UBH's
Guidelines Deficient.............................................................16

    C.   The Court Reaffirmed Class Certification, Ordered UBH To
Reprocess 67,000 Claims, And Granted A Ten-Year
Prospective Injunction.........................................................19

SUMMARY OF ARGUMENT .............................................................20

STANDARD OF REVIEW ..................................................................23

ARGUMENT ........................................................................................24

I.    The District Court Erred In Excusing Plaintiffs From Proving
Causation ..................................................................................24

A.    Article III Required A Causal Link To Each Coverage Denial ..........25

B.    ERISA Section 1132 Required Proof Of Causation ...........................31

    1.    Plaintiffs Failed To Show A Causal Link To "Benefits Due" Under Section 1132(a)(1)(B) ......................................................32

    2.    ERISA's Other Remedy Provisions Cannot Save Plaintiffs' Claims....... ........................................................................36

C.    Rule 23 And The Rules Enabling Act Forbid Excusing Causation To Facilitate Class Actions ...................................................41

II.    The District Court Usurped UBH's Authority To Set Guidelines And Interpret Plan Terms ...........................................................................43

A.    The Court Erred By Rewriting The Plans To Require Coverage Consistent With Generally Accepted Standards ..................................45

B.    The Court Applied The Wrong Standard Of Review To UBH's Clinical Judgments About Generally Accepted Standards ................50

C.    The Court Erred In Holding That UBH Had A Conflict Of Interest In Administering Self-Funded Plans.....................................55

D.    The Court Ignored How UBH's Clinicians Apply The Guidelines In Practice .........................................................................57

III.    The District Court Erred By Excusing Absent Class Members From The Plan-Imposed Requirement To Exhaust Administrative Remedies ....................................................................................................59

CONCLUSION ........................................................................................................64

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abatie v. Alta Health & Life Ins. Co.*,
   458 F.3d 955 (9th Cir. 2006) (en banc) ..............................................54

*Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*,
   2016 WL 6601662 (C.D. Cal. Feb. 3, 2016) ........................................38

*Amato v. Bernard*,
   618 F.2d 559 (9th Cir. 1980) .........................................................59, 60

*Anderson v. Intel Corp.*,
   2021 WL 229235 (N.D. Cal. Jan. 21, 2021)..........................................39

*Andrews v. Shalala*,
   53 F.3d 1035 (9th Cir. 1995) ...............................................................51

*Banuelos v. Constr. Laborers' Tr. Funds*,
   382 F.3d 897 (9th Cir. 2004) .................................................................4

*Barnes v. AT&T Pension Benefit Plan-Nonbargained Program*,
   270 F.R.D. 488 (N.D. Cal. 2010)..........................................................61

*Barron v. Blue Cross Blue Shield of Michigan*,
   534 F. App'x 344 (6th Cir. 2013) ........................................................56

*Black & Decker Disability Plan v. Nord*,
   538 U.S. 822 (2003)........................................................................5, 46

*Boyd v. Bert Bell/Pete Rozelle NFL Players Ret. Plan*,
   410 F.3d 1173 (9th Cir. 2005) .................................................23, 51, 56

*Canseco v. Constr. Laborers Pension Tr.*,
   93 F.3d 600 (9th Cir. 1996) .................................................................35

*Castillo v. BOA*,
   980 F.3d 723 (9th Cir. 2020) ...............................................................42

*Castillo v. Cigna Healthcare*,
   11 F. App'x 945 (9th Cir. 2001) ..........................................................55

iv

*Castillo v. Metro. Life Ins. Co.*,
970 F.3d 1224 (9th Cir. 2020) ..........................................................6, 7, 37, 38, 60

*Chorosevic v. MetLife Choices*,
2009 WL 723357 (E.D. Mo. Mar. 17, 2009)......................................................38

*Chu v. CFTC*,
823 F.3d 1245 (9th Cir. 2016) .............................................................................51

*Churchill v. Cigna Corp.*,
2011 WL 3563489 (E.D. Pa. Aug. 12, 2011) ....................................................60

*CIGNA Corp. v. Amara*,
563 U.S. 421 (2011)...........................................................................................5, 7

*Coffin v. Bowater Inc.*,
228 F.R.D. 397 (D. Me. 2005).............................................................................60

*Conkright v. Frommert*,
559 U.S. 506 (2010)..........................................................................6, 32, 44, 50

*Conley v. Pitney Bowes*,
34 F.3d 714 (8th Cir. 1994) .................................................................................59

*Cox v. Keystone Carbon Co.*,
894 F.2d 647 (3d Cir. 1990) ................................................................................40

*Day v. AT&T Disability Income Plan*,
698 F.3d 1091 (9th Cir. 2012) ......................................................................45, 55

*Democratic Nat'l Comm. v. Hobbs*,
948 F.3d 989 (9th Cir. 2020) (en banc) ..............................................................24

*Dennis F. v. Aetna Life Ins.*,
2013 WL 5377144 (N.D. Cal. Sept. 25, 2013)...................................................42

*Depot, Inc. v. Caring for Montanans, Inc.*,
915 F.3d 643 (9th Cir. 2019) ..............................................................................37

*Des Roches v. Cal. Physicians' Serv.*,
320 F.R.D. 486 (N.D. Cal. 2017).........................................................................61

*Diaz v. United Agric. Emp. Welfare Benefit Plan*,
  50 F.3d 1478 (9th Cir. 1995) ...............................................................63

*Firestone Tire & Rubber Co. v. Bruch*,
  489 U.S. 101 (1989)......................................................................37, 45

*Gene & Gene, LLC v. BioPay, LLC*,
  624 F.3d 698 (5th Cir. 2010) .............................................................25

*Gollust v. Mendell*,
  501 U.S. 115 (1991).............................................................................40

*Graddy v. BlueCross BlueShield*,
  2010 WL 670081 (E.D. Tenn. Feb. 19, 2010)....................................42

*Great-W. Life & Annuity Ins. Co. v. Knudson*,
  534 U.S. 204 (2002)...............................................................6, 37, 38

*Heimeshoff v. Hartford Life & Accident Ins. Co.*,
  571 U.S. 99 (2013)...............................................................................62

*Hein v. FDIC*,
  88 F.3d 210 (3d Cir. 1996) .................................................................38

*In re Household Int'l Tax Reduction Plan*,
  441 F.3d 500 (7th Cir. 2006) ...............................................60, 61, 62

*Huntsinger v. Shaw Grp., Inc.*,
  268 F. App'x 518 (9th Cir. 2008) ................................................31, 32

*Kearney v. Standard Ins. Co.*,
  175 F.3d 1084 (9th Cir. 1999) (en banc) ............................................6

*Lehman v. Nelson*,
  943 F.3d 891 (9th Cir. 2019) .................................23, 24, 44, 52, 59

*Leon v. Standard Ins. Co.*,
  2016 WL 768908 (C.D. Cal. Jan. 28, 2016)......................................61

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014)......................................................................31, 40

*Lipstein v. UnitedHealth Grp.*,
  296 F.R.D. 279 (D.N.J. 2013)................................................................46

*M&G Polymers USA, LLC v. Tackett*,
  574 U.S. 427 (2015)..........................................................................6

*Mass. Mut. Life Ins. Co. v. Russell*,
  473 U.S. 134 (1985)................................................................7, 13, 39

*McCartha v. Nat'l City Corp.*,
  419 F.3d 437 (6th Cir. 2005) ...............................................................35

*Metro. Life Ins. Co. v. Glenn*,
  554 U.S. 105 (2008)......................................................7, 33, 44, 55, 62

*Morris v. Am. Elec. Power Long-Term Disability Plan*,
  399 F. App'x 978 (6th Cir. 2010) ...........................................................56

*Muransky v. Godiva Chocolatier, Inc.*,
  979 F.3d 917 (11th Cir. 2020) (en banc) ....................................................27

*New York v. Ferber*,
  458 U.S. 747 (1982)........................................................................43

*Noren v. Jefferson Pilot Fin. Ins. Co.*,
  378 F. App'x 696 (9th Cir. 2010) ...........................................................63

*Ortiz v. Fibreboard Corp.*,
  527 U.S. 815 (1999)........................................................................41

*Pannebecker v. Liberty Life Assurance Co.*,
  542 F.3d 1213 (9th Cir. 2008) ..............................................................34

*Pecere v. Empire Blue Cross & Blue Shield*,
  194 F.R.D. 66 (E.D.N.Y. 2000) .............................................................42

*Pierce v. Wyndham Worldwide Operations, Inc.*,
  791 F. App'x 45 (11th Cir. 2019) .......................................................55, 56

*Ramirez v. TransUnion LLC*,
  951 F.3d 1008 (9th Cir. 2020) ......................................................19, 24, 25

*Renfro v. Funky Door Long Term Disability Plan*,
686 F.3d 1044 (9th Cir. 2012) ....................................................33

*Richardson v. Pension Plan of Bethlehem Steel Corp.*,
112 F.3d 982 (9th Cir. 1997) .....................................................49

*Robins v. Spokeo*,
867 F.3d 1108 (9th Cir. 2017) ....................................................26

*Romberio v. UnumProvident Corp.*,
385 F. App'x 423 (6th Cir. 2009) ...........................................32, 38

*Ryan S. v. UnitedHealth Grp., Inc.*,
2020 WL 6723443 (C.D. Cal. Aug. 14, 2020) ..............................39

*Sabri v. United States*,
541 U.S. 600 (2004)...................................................................43

*Saffle v. Sierra Pac. Power Co.*,
85 F.3d 455 (9th Cir. 1996) .......................... 32, 33, 34, 35, 36, 37, 41

*Schmookler v. Empire Blue Cross & Blue Shield*,
107 F.3d 4 (2d Cir. 1997) ...........................................................60

*Scoles v. Intel Corp. Long Term Disability Benefit Plan*,
657 F. App'x 667 (9th Cir. 2016) ................................................55

*Sedlack v. Braswell Servs. Grp., Inc.*,
134 F.3d 219 (4th Cir. 1998) ......................................................38

*Shaver v. Operating Eng'rs*,
332 F.3d 1198 (9th Cir. 2003) ....................................................39

*Snow v. Standard Ins. Co.*,
87 F.3d 327 (9th Cir. 1996) ...............................6, 23, 29, 33, 45, 51

*Spinedex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.*,
770 F.3d 1282 (9th Cir. 2014) ....................................................32

*Spokeo, Inc. v. Robins*,
136 S. Ct. 1540 (2016)......................................................2, 25, 26, 27

viii

*Stephens v. U.S. Airways Grp., Inc.*,
  2012 WL 13054263 (D.D.C. July 18, 2012) ......................................................60

*Thole v. U.S. Bank N.A.*,
  140 S. Ct. 1615 (2020).........................................................2, 19, 26, 27, 38, 39

*United States v. Salerno*,
  481 U.S. 739 (1987)...........................................................................................43

*Upadhyay v. Aetna Life Ins. Co.*,
  645 F. App'x 569 (9th Cir. 2016) ......................................................................62

*Varity Corp. v. Howe*,
  516 U.S. 489 (1996)...............................................................................7, 36, 37

*Vaught v. Scottsdale Healthcare Corp. Health Plan*,
  546 F.3d 620 (9th Cir. 2008) .............................................................................62

*Vizcaino v. Microsoft Corp.*,
  120 F.3d 1006 (9th Cir. 1997) (en banc) ..........................................................34

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011).....................................................................................41, 61

*Wash. State Grange v. Wash. State Republican Party*,
  552 U.S. 442 (2008).....................................................................................42, 43

*Webb v. Hartford Fin. Servs. Grp., Inc.*,
  608 F. Supp. 2d 1218 (C.D. Cal. 2009) .............................................................52

*In re WellPoint, Inc. Out-Of-Network "UCR" Rates Litig.*,
  2014 WL 6888549 (C.D. Cal. Sept. 3, 2014) ....................................................46

*Wells Fargo Bank, N.A. v. Mahogany Meadows Ave. Tr.*,
  979 F.3d 1209 (9th Cir. 2020) ..........................................................................43

*Williamson v. UNUM Life Ins. Co.*,
  160 F.3d 1247 (9th Cir. 1998) ..........................................................................33

*Williby v. Aetna Life Ins. Co.*,
  867 F.3d 1129 (9th Cir. 2017) ..............................................................51, 55, 56

*Winters v. Costco Wholesale Corp.*,
    49 F.3d 550 (9th Cir. 1995) .................................................................51

*Ziegler v. CIGNA*,
    916 F.2d 548 (9th Cir. 1990) ...............................................................39

*Zurich Am. Ins. Co. v. O'Hara*,
    604 F.3d 1232 (11th Cir. 2010) ...........................................................62

**Statutes**

28 U.S.C. § 1291 .....................................................................................4

28 U.S.C. § 1292(a)(1) ...........................................................................4

28 U.S.C. § 1331 .....................................................................................4

28 U.S.C. § 2072(b) ........................................ 3, 4, 5, 21, 22, 23, 24, 41, 59, 61, 64

29 U.S.C. § 1132 ...............................................................................31, 36

29 U.S.C. § 1132(a)(1)(B) ........ 2, 6, 7, 13, 14, 16, 21, 22, 32, 33, 34, 36, 37, 39, 40

29 U.S.C. § 1132(a)(3) .................................... 7, 13, 16, 22, 36, 37, 38, 39

**Rules**

Fed. R. Civ. P. 23 ............................................. 3, 4, 5, 21, 22, 23, 24, 41, 59, 61, 64

Fed. R. Civ. P. 23(a)(2) ....................................................................15, 42

Fed. R. Civ. P. 23(a)(3) ....................................................................15, 42

Fed. R. Civ. P. 23(b)(1) ...........................................................................15

Fed. R. Civ. P. 23(b)(1)(A) ......................................................................19

Fed. R. Civ. P. 23(b)(2) .....................................................................15, 19

Fed. R. Civ. P. 23(b)(3) .................................................................15, 20, 42

Fed. R. Civ. P. 52(c) ...............................................................................17

**Constitutional Provisions**

U.S. Const., Art. III ................... 2, 4, 5, 16, 19, 21, 24, 25, 26, 27, 31, 38, 40, 42, 64

## INTRODUCTION

This case shows why the procedural device of a class action may not be invoked to alter substantive law.  The district court acknowledged it was eliminating the causation element of Plaintiffs' claims precisely so it could certify the case as a class action.  That alone was reversible error.  The court then conducted a class-action bench trial during which Plaintiffs were excused from introducing any evidence proving that the challenged conduct harmed anyone.  Instead, the court found United Behavioral Health ("UBH") liable based solely on the court's conclusion that the medical guidelines UBH doctors used as part of making health benefit coverage decisions were not in all ways consistent with "generally accepted" medical standards of care.  The court ordered UBH to "reprocess" 67,000 benefits determinations under court-mandated guidelines, even though many class members could not show that the alleged guidelines flaws caused them to be denied coverage or even that they obtained the requested services (and thus could receive any possible benefit payments after reprocessing).  The court ultimately entered judgment without any finding, ever, that Plaintiffs satisfied the causation element of their claims.

That basic failure of proof was not an accident.  Throughout the proceedings, Plaintiffs expressly disclaimed any attempt to show causation.  Plaintiffs made this extraordinary concession because addressing causation would have revealed fundamental flaws in their case and class theory.  Pursuing the traditional remedy provided

by the Employee Retirement Income Security Act ("ERISA")—payment of "benefits due," 29 U.S.C. § 1132(a)(1)(B)—would have required challenging thousands of highly individualized coverage decisions by UBH's doctors concerning the appropriate level of care for a particular class member based on that individual's full administrative record. The district court acknowledged that, if individualized causation issues were considered, class certification would be impossible.

Instead of simply denying class certification, the court embraced Plaintiffs' novel "facial" challenge to some of the guidelines that UBH doctors used in their discretionary coverage reviews. Under this theory, *any* reference to any part of the challenged guidelines during the doctors' reviews deprived Plaintiffs of the intangible procedural right to a "fair adjudication" of their coverage requests. Plaintiffs insisted that UBH must thus reprocess all class members' denials of coverage.

Plaintiffs admit no appellate court has ever endorsed this "reprocessing" theory. This Court should not be the first. To begin, Plaintiffs' vague procedural injuries (to a "fair adjudication") do not satisfy Article III standing under *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016). "There is no ERISA exception" to this jurisdictional rule. *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1622 (2020).

Plaintiffs' reprocessing theory also contravened ERISA itself. ERISA requires plaintiffs to show benefits were improperly denied before obtaining relief (equitable or otherwise). ERISA does not create a cause of action for violating the

2

intangible procedural right to "fair adjudication" of a request. If an individual plaintiff asserted that novel procedural claim under ERISA, no court would entertain it. That Plaintiffs asserted the same claim here in a putative class action does not alter that result. Plaintiffs' end-run around settled statutory requirements to facilitate class certification violated Federal Rule of Civil Procedure 23, the Rules Enabling Act, and ERISA.

The court's decision violated ERISA in another respect. The court found that UBH's guidelines were inconsistent with the "generally accepted" medical standards proffered by Plaintiffs' experts at trial. 1-ER-92. But ERISA does not require plans to cover all "generally accepted" treatment, and the plans here included numerous additional requirements that UBH was authorized—and often *required*—to apply in its role as a claims administrator. The court effectively rewrote the plans to eliminate coverage limits set by plan sponsors. It then substituted its own medical judgment for the judgment UBH exercised in promulgating the guidelines. The court thereby flouted both the terms of the pertinent plans and the deference owed to UBH in administering them.

Finally, the district court erred by excusing class members from the requirement their plans expressly imposed that they exhaust administrative remedies before seeking judicial relief. The court conflated this plan-imposed requirement with a separate, judge-made, prudential exhaustion requirement that some courts excuse in

class actions. Relaxing requirements to facilitate class certification violates the Rules Enabling Act, and overriding plan terms violates ERISA.

If upheld, the decision below foretells an avalanche of litigation seeking to substitute a judicial command-and-control model of employer healthcare for the broad discretionary authority that ERISA allows plan sponsors to vest in their claims administrators. The decision also threatens to overload administrators with the burden of reprocessing thousands of coverage determinations without any showing that those efforts will impact coverage. The judgment cannot be squared with Article III, Rule 23, the Rules Enabling Act, or ERISA. This Court should reverse.

## JURISDICTIONAL STATEMENT

The district court exercised jurisdiction under 28 U.S.C. § 1331, entered its remedies order on November 3, 2020, 1-ER-92-190, and entered final judgment on February 1, 2021, 1-ER-2-58. UBH filed timely notices of appeal on December 3, 2020 and February 2, 2021. 14-ER-2850-2861. The final judgment is appealable under 28 U.S.C. § 1291. The remedies order is also appealable under: (1) 28 U.S.C. § 1292(a)(1), because it "grant[s]" an "injunctio[n]," *id*.; and (2) *Banuelos v. Construction Laborers' Trust Funds*, because it resolves multiple "separable legal issue[s]," it remands to UBH to "apply a potentially erroneous rule which may result in a wasted proceeding," and review may be "foreclosed if an immediate appeal were unavailable," 382 F.3d 897, 903 (9th Cir. 2004).

## ISSUES PRESENTED

**I.**     Did the district court err—under Article III of the Constitution, ERISA, Federal Rule of Civil Procedure 23, and the Rules Enabling Act—in certifying a class action and granting classwide relief despite Plaintiffs' conceded failure to prove a causal link between alleged flaws in Defendants' challenged guidelines and the denial of class members' requests for coverage?

**II.**     Did the district court ignore plan terms and fail to afford UBH the deference due under ERISA?

**III.**     Did the district court err by excusing class members from satisfying their plans' administrative exhaustion requirements?

## STATUTORY PROVISIONS AND RULES

Pertinent materials are in the addendum.  *See* Cir. R. 28-2.7.

## STATEMENT OF THE CASE

**I.     ERISA's Comprehensive Scheme Governs Benefit Plans And Provides Specific Remedies**

ERISA is the comprehensive federal statute governing employee benefit plans, including health plans.  ERISA plan sponsors (typically employers) establish written plans—essentially, "contracts"—governing the benefits they choose to offer employees.  *CIGNA Corp. v. Amara*, 563 U.S. 421, 440 (2011).  ERISA does not "mandate what kind of benefits [to] provide."  *Black & Decker Disability Plan v. Nord*,

538 U.S. 822, 833 (2003). Rather, it sets "'uniform standards'" for plan administration, and "'uniform … remedi[es]'" so that employees receive the benefits their plans provide. *Conkright v. Frommert*, 559 U.S. 506, 517 (2010). By "'assuring a predictable set of liabilities,'" ERISA "'induc[es] employers to offer benefits.'" *Id.*

ERISA's "'linchpin'" is its "'focus on the written terms of the plan.'" *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015). Employers retain "'leeway to design … plans as they see fit,'" and courts enforce plan provisions "'as written.'" *Id.* Plans may grant administrators "'discretionary authority to determine eligibility for benefits or to construe the terms of the plan,'" and courts respect that authority by giving "deference" to the administrator's discretionary decisions. *Conkright*, 559 U.S. at 512. The "proper and efficient functioning" of ERISA plans "often depend[s] upon the use of [this] discretion." *Snow v. Standard Ins. Co.*, 87 F.3d 327, 330 (1996), *overruled on other grounds by Kearney v. Standard Ins. Co.*, 175 F.3d 1084 (9th Cir. 1999) (en banc).

ERISA's remedial scheme is "'comprehensive and reticulated.'" *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 209 (2002). Two remedial provisions are relevant here:

**29 U.S.C. § 1132(a)(1)(B)** permits a plan member "to recover benefits due to him under the terms of his plan," *id.*, if the plan denies a valid request for benefits and the member exhausts the plan's "administrative review" procedures, *Castillo v.*

6

*Metro. Life Ins. Co.*, 970 F.3d 1224, 1228 (9th Cir. 2020). Courts review an administrator's discretionary benefits determinations "'*deferential[ly]*'" for "'abuse of discretion.'" *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008). Such review also "provides a remedy for breaches of fiduciary duty with respect to the interpretation of plan documents and the payment of claims." *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996).

Section 1132(a)(1)(B) separately authorizes claims to "enforce" or "clarify" rights "under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). These provisions permit a member "to obtain a declaratory judgment that she is entitled to benefits under the provisions of the plan contract, and to enjoin the plan administrator from improperly refusing to pay benefits in the future." *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 147 (1985).

**29 U.S.C. § 1132(a)(3)** permits claims for "appropriate equitable relief," *id.*, as a "'catchall'" remedy for violations that ERISA "does not elsewhere adequately remedy"—for example, "breaches of other sorts of fiduciary obligation" not involving "the payment of claims." *Varity*, 516 U.S. at 512. But a plaintiff "may not bring a claim for denial of benefits under [Section] 1132(a)(3)," *Castillo*, 970 F.3d at 1229, and relief is limited to remedies that were "'*typically* available in equity,'" *Amara*, 563 U.S. at 439.

## II.   UBH Uses Clinical Guidelines To Facilitate Its Discretionary Review Of Mental Health And Substance Use Disorder Coverage Under Thousands Of ERISA Plans

UBH administers benefits for the treatment of mental health conditions and substance use disorders for thousands of health benefit plans nationwide. 2-ER-336. Plan sponsors hire UBH to process requests for benefits and determine coverage. 7-ER-1289:8-1291:1. Most of the plans at issue are "self-funded," 2-ER-319, meaning sponsors bear the cost of paying covered benefits, 2-ER-252.

ERISA requires UBH to "comply with plan terms" and approve benefits only when covered by the plan. 2-ER-327. For example, the plans at issue limit coverage to treatment consistent with "**generally accepted standards of care**"—the limitation on which Plaintiffs base their claims. 2-ER-253. But plans also limit benefits "*even if* the treatment would otherwise be consistent with generally accepted standards of care." 7-ER-1330:7-15 (emphasis added). The plans vary widely in whether they explicitly limit coverage to services that are "**medically necessary**," *see* 2-ER-247, how they define that term, 7-ER-1314:8-1318:20, and what additional limits they impose on coverage. For example, some plans expressly exclude "**experimental**" treatment, 13-ER-2735, or "**custodial care**," 13-ER-2789-2827; some require that "**treatment be provided by medical professionals**," 2-ER-310; and some limit treatment to "**short-term**" interventions, 13-ER-2771, or the "**least costly alternative**" that is "medically appropriate," 13-ER-2767.

8

The plans give UBH discretion to interpret plan terms in determining whether requested services are covered. 2-ER-253. UBH exercises this discretion through a multi-level review process conducted by psychiatrists, psychologists, and other trained clinicians. 2-ER-251-252. A nursing- or master's-degree-level "**Care Advocate**" makes the initial assessment and may approve coverage or refer the request to a UBH physician or Ph.D.-level "**Peer Reviewer**." 2-ER-251, 7-ER-1396:5-16. The Peer Reviewer then approves or denies coverage after seeking input from the member's treating provider. 2-ER-251-252; 7-ER-1396:16-1397:11, 1399:1-8; 1403:17-19.

To guide these individualized, discretionary determinations, UBH develops and employs hundreds of internal guidelines, which it makes publicly available. 2-ER-339; *see*, *e.g.*, 12-ER-2643. Many plans expressly tie coverage to UBH's guidelines, *e.g.*, by excluding coverage for **services that are "not consistent with [UBH's] level of care guidelines**." 13-ER-2847. In making benefits decisions, UBH's clinicians use these guidelines, and also consider plan documents; medical records; consultations with and letters from patients, their providers, and advocates; and their own clinical judgments. 7-ER-1396:12-16, 1399:1-8, 1403:17-19.

UBH approves coverage for over 90% of all requests, but denies requests that, in its judgment, do not meet plan requirements. 7-ER-1396:24-1397:7. When UBH denies a request, the Peer Reviewer typically offers coverage for another level of

care that better matches the member's current needs and is covered under the member's plan. 7-ER-1401:22-1402:18; 9-ER-1835:13-21. For example, the plan may approve outpatient but not residential care under the circumstances. UBH then sends a written denial letter notifying the provider and the member of the rationale for its decision and the member's appeal rights under the plan. 2-ER-252, 7-ER-1401:22-1402:6. The process is as follows:

> Member seeks medical necessity determination (often through preauthorization process)



> UBH reviewer makes medical necessity determination, based on plan terms, clinical judgment, input from treating provider, medical records, and various guidelines



> If request is denied (<10% of the time), UBH typically offers coverage for another level of care



> Member may opt to receive covered alternate care or pursue administrative appeal



> Whether member or provider ultimately submits a claim depends on what services received, financial arrangement between member and treating provider, and other factors

Appeal rights differ among plans and often include external review by an independent physician or state insurance agency not affiliated with UBH. 2-ER-326, 7-ER-1293:6-8, 1402:25-1403:6. Each plan requires members to exhaust the applicable administrative appeals before seeking ERISA remedies in court. 2-ER-326.

## III. Plaintiffs Challenged 67,000 Coverage Determinations Citing Hundreds Of UBH's Guidelines

Plaintiffs purport to represent tens of thousands of members of about 3,000 different plans—each with distinct terms—who were denied coverage "in whole or in part" "based upon" more than 200 of UBH's guidelines. 2-ER-334; 1-ER-110, 194-195. By "based upon," Plaintiffs mean the guidelines were "referenced" in a denial letter as one document considered—not that the guidelines or their alleged flaws in whole or even in part *caused* the denial of coverage. 2-ER-369-370.

The guidelines "referenced" in these letters are the **Level of Care Guidelines ("LOCGs")**, which are used for plans that limit coverage to "medically necessary" services, or one of the **Coverage Determination Guidelines ("CDGs")**, which are used for plans without that express requirement. 2-ER-247. UBH developed these guidelines based on published scientific evidence—including government sources, national guidelines, and consensus statements—to inform coverage determinations, promote evidence-based and medically necessary practices, and support members' recovery, resiliency, and well-being. 12-ER-2645, 2651; 5-ER-899:4-14; 7-ER-1391:15-1392:20, 1415:15-18; 9-ER-1861:12-18, 2-ER-316-318. Each guideline

11

was developed and annually updated to reflect feedback from external clinicians and professional societies and was accredited by "the two leading [independent] organizations that accredit utilization management processes for major health plans." 2-ER-316-318.

Plaintiffs mainly challenged certain parts of the LOCGs (other parts were not challenged or were upheld), as well as a handful of CDGs addressing limits on around-the-clock "custodial" care (the "**Custodial Care CDGs**"). 1-ER-217; 2-ER-250. Plaintiffs also challenged 209 CDGs for specific medical conditions (the "**Diagnosis-Specific CDGs**"), but "only to the extent that [those CDGs] incorporate the [LOCGs]." 2-ER-250-251; 1-ER-217.

The certified classes encompass nearly 67,000 requests between 2011 and 2017 seeking coverage of all kinds of mental health or substance use disorders, at three different levels of care: "**residential**" (intensive 24-hour care), "**intensive outpatient**" (typically, a 9-hours-per-week structured program), and "**outpatient**" ("once- or twice-a-week psychotherapy"). 2-ER-236-237, 248, 258-261. Class membership is not limited to individuals who exhausted their administrative remedies (most did not). 2-ER-325-326; 13-ER-2829-2835. Nor are the classes limited to persons who received the services they originally sought. 1-ER-135-136. Indeed, for many members there are no claims or reimbursable costs associated with the denials, because they opted to receive the alternate covered treatments. 2-ER-427-

429, 15-ER-3057-3063.  These members cannot receive any benefits through a re-processing because ERISA claims are limited to "contractually defined benefits" and the statute does not "authorize the recovery of extracontractual damages."  *Russell*, 473 U.S. at 148.

## IV.    Plaintiffs Framed Their Claim As A "Facial" Challenge Based On A "Procedural" Injury

To avoid the obvious claim-specific and plan-specific issues associated with their claims, Plaintiffs cast their liability theory as a "facial" challenge to UBH's guidelines.  2-ER-239.  They claimed that those guidelines unreasonably interpret *one* requirement for coverage—that services be consistent with generally accepted standards of care.  Plaintiffs proposed other guidelines they claimed give more weight to underlying conditions, or less acute conditions, or that define custodial care differently.  2-ER-255-258.  Plaintiffs asserted that UBH abused its discretion and violated its fiduciary duties by using its own guidelines, rather than Plaintiffs' preferred guidelines.  2-ER-238-239.  They sought relief under 29 U.S.C. § 1132(a)(1)(B) and (a)(3).  *Id.*

The theory of Plaintiffs' facial challenge is that, if they could establish at trial that UBH's guidelines were flawed in some way, UBH must reprocess every denial citing the guidelines "without [Plaintiffs first] establishing that the alleged violation has caused an actual loss, such as a denial of benefits."  1-ER-79-80.  The district court recognized that "Plaintiffs' claims would fail for lack of causation" if they

13

needed to show a causal link to denial of benefits, and Plaintiffs "stipulated that they d[id] not seek" to make that showing. 1-ER-77. That stipulation addressed the court's acknowledgment that the question "whether individual class members were actually entitled to benefits" would turn on "a multitude of individualized circumstances relating to the medical necessity for coverage and the specific terms of the member's plan," precluding class certification. 2-ER-239.

To avoid that problem, Plaintiffs argued that the harm underlying their claims was not the "denial of benefits," but rather the supposed "intangible," "procedural violation" of "their right to fair adjudication of their claims for coverage based on Guidelines that were developed solely for their benefit." 2-ER-332; 1-ER-77-82. Unlike in a typical Section 1132(a)(1)(B) claim for "benefits due" under an ERISA plan, Plaintiffs thus squarely disclaimed any burden to prove they were wrongfully denied benefits—or that they would receive benefits if successful in court. 1-ER-77.

Instead, Plaintiffs sought "reprocessing" as a purported remedy to the denial of "fair adjudication"—*i.e.*, an order requiring UBH to reassess 67,000 coverage determinations using different guidelines. 1-ER-65-66, 82. Plaintiffs admitted that many reprocessed requests would be denied again, and they offered no evidence about the extent to which reprocessing would result in *any* benefits to *any* class members. *See* 2-ER-239; 1-ER-183, 194. Plaintiffs also sought a declaration that

UBH's guidelines were unlawful, and a prospective injunction requiring UBH to apply different guidelines going forward under court-imposed rules and supervision. 1-ER-149.

## V.    The District Court Granted Classwide Relief

Accepting Plaintiffs' procedural-harm theory, the court certified a class, 2-ER-335-389, and held a bench trial, 3-ER-453 through 11-ER-2397. In opposing class certification and seeking summary judgment, UBH argued that Plaintiffs failed to establish causation, but the court rejected those arguments. 2-ER-386-389; 1-ER-69-81. The court then accepted Plaintiffs' critiques of the guidelines, 2-ER-229-334; 1-ER-216-222, and ordered reprocessing, declaratory relief, and a prospective injunction, 1-ER-92-190.

### A.    The Court Accepted Plaintiffs' "Procedural Harm" Theory And Certified A Class Action

The court certified the class under Rule 23(b)(1), (2), and (3). 2-ER-372-389. To satisfy commonality, typicality, and predominance under Rule 23(a)(2), (a)(3), and (b)(3), the court reduced the case to a single question: "whether the use of UBH's Guidelines … constituted a breach of fiduciary duty or was arbitrary and capricious" because the Guidelines were not "consistent with generally accepted standards." 2-ER-364, 368, 387. Despite "variations" in plan language, the court held that each plan "require[d] coverage consistent with generally accepted standards of care," so Plaintiffs needed only to show that the guidelines were "inconsistent

with those standards" in some way. 2-ER-365-368. The court likewise dismissed any "variations relating to the putative class members' … medical necessity determinations" as "not material to [Plaintiffs'] theories." 2-ER-364-365. The court held there was no need for it to decide "whether class members were *actually* entitled to benefits." 2-ER-365.

In denying UBH's summary judgment motion, the court further held that neither Article III nor ERISA required Plaintiffs to "demonstrate that flaws in their Guidelines actually caused the Plaintiffs' denial of benefits." 1-ER-81. For the court, "the defective *process*" allegedly "applied to the determination of the plaintiff's coverage" was enough to establish standing. 1-ER-79. And the court approved Plaintiffs' claims under Section 1132(a)(3)'s cause of action for "appropriate equitable relief" and the portions of Section 1132(a)(1)(B) authorizing declaratory and prospective injunctive relief, regardless of their right to benefits for past treatment. 1-ER-78.

## B. The Court Limited Its Deference To UBH And Found UBH's Guidelines Deficient

The court bifurcated the proceedings into "liability" and "remedies" phases, and excluded the issue of causation from both. 1-ER-92-93. Following a 10-day bench trial, the court in the liability phase accepted many of Plaintiffs' critiques of the guidelines. 2-ER-229-334.

Plaintiffs' novel approach dictated the scope of the trial record. Plaintiffs relied almost entirely on experts who advanced facial critiques of UBH's guidelines—for example, claiming they focused too much on "acute symptoms"—while ignoring the broader administrative records and evidence on which class members' coverage determinations were actually based. 2-ER-239-241, 258-259. Plaintiffs' experts admitted they did not review the terms of any plans, and their testimony did not address how UBH applied the guidelines in practice. 3-ER-648:4-23; 6-ER-1113:2-12; 2-ER-239-241. Indeed, the court rejected as not "credible" the only testimony (offered by UBH) addressing how the guidelines were applied in practice, finding it inconsistent with the court's own reading of the guidelines. 2-ER-283-284.

At the close of Plaintiffs' evidence and again at the end of the liability phase, UBH moved for judgment on partial findings under Rule 52(c), renewing its argument that Plaintiffs must prove causation and the guidelines must be judged against the plans "as a whole"—not just a facial comparison of the guidelines to isolated plan provisions referring to generally accepted standards. 7-ER-1281:7-1283:16; 11-ER-2282:23-25. The court denied the motion. 1-ER-226:16-18.

The court next made written liability findings. While purporting to apply ERISA's deferential "abuse of discretion" standard, 2-ER-329, the court effectively denied any deference to UBH for two reasons. *First*, the court viewed UBH's guidelines with "significant skepticism" because it believed that UBH had a

17

"structural conflict of interest" that drove it to "keep benefit expenses down," 2-ER-330-332—even though most of the plans were self-funded and plan sponsors, not UBH, bore the cost of paying benefits, and even though many plans expressly directed UBH to consider costs in making coverage decisions. *Id.*; 7-ER-1312:7-1313:19. *Second*, rather than deferentially reviewing *UBH's* interpretation of generally accepted standards under a clear-error or substantial-evidence standard, the court applied a "preponderance of the evidence" standard to decide which medical standards *it* believed were generally accepted. 2-ER-261.

Applying that standard, the court found UBH liable. It upheld some challenged LOCG and Custodial Care CDG provisions, 2-ER-285-286 & n.14, 293-294, 299 n.17, but found others deficient, 2-ER-270-306. The court later held that parts of the Diagnosis-Specific CDGs—on which Plaintiffs presented no testimony at trial, 2-ER-250-251—were deficient because they each mentioned the LOCGs at least once, and thus "incorporated" them by reference, 1-ER-217-222.

Finally, the court rejected UBH's argument that absent class members must exhaust applicable administrative remedies. 2-ER-325-326. The court found it sufficient that each *named Plaintiff* satisfied the exhaustion requirement. 2-ER-325. And because UBH also applied its guidelines in administrative appeals, the court found that exhaustion would be futile, 2-ER-325-326, even though UBH overturned

initial denials—and members received all benefits requested—15-20% of the time.
13-ER-2829-2835; 9-ER-1940:10-17, 1958:10-12, 1959:18-1961:4.

**C.  The Court Reaffirmed Class Certification, Ordered UBH To Reprocess 67,000 Claims, And Granted A Ten-Year Prospective Injunction**

After the court entered its liability findings, UBH moved to decertify the class. UBH argued that Plaintiffs failed to offer classwide proof of causation or exhaustion of administrative remedies, and that the classes improperly included uninjured members. 1-ER-201-205. In support, UBH identified two controlling post-certification decisions: *Thole*, which held that a bare violation of ERISA's fiduciary-duty provision was insufficient to establish Article III standing, 140 S. Ct. at 1619; and *Ramirez v. TransUnion LLC*, which held that each class member must establish Article III standing to receive individual relief, 951 F.3d 1008, 1023 (9th Cir. 2020). 2-ER-445-448. Without addressing either holding, the court largely denied UBH's motion. 1-ER-191-215. The court did partially decertify the class to exclude members whose denials were fully overturned on administrative appeal. 1-ER-205.

The court then issued its remedies order, awarding prospective declaratory and injunctive relief under Rule 23(b)(1)(A) and (b)(2). 1-ER-101, 169. The declaratory relief incorporates the court's findings about generally accepted standards and UBH's guidelines. 1-ER-176-180. The injunction requires UBH to use Plaintiffs' preferred guidelines (which UBH had already voluntarily adopted)

19

and implement training and other personnel requirements for the next ten years under court supervision. 1-ER-155, 160, 186-189.

The court also ordered retrospective reprocessing of 67,000 benefits determinations using Plaintiffs' preferred guidelines under Rule 23(b)(3). 1-ER-110, 132-148. The order requires UBH to provide class notice and complete reprocessing in a matter of months. 1-ER-181-185.

If reprocessing results in approval of coverage, UBH must pay the member the benefits amount, plus interest. 1-ER-184-186. But UBH must complete reprocessing for all class members whether or not it may result in approval of coverage, *id.*, *even though many members never obtained the requested treatment* and are therefore ineligible for payment of benefits. 2-ER-427-429, 15-ER-3057-3063. Plaintiffs concede that, under ERISA, class members "will be entitled to reimbursement only for services they actually received," if approved for coverage in the reprocessing. 1-ER-135-136. Building a reprocessing regime alone is expected to cost UBH more than $30 million, and require thousands of hours by clinical professionals, with no evidence that it will provide a tangible benefit to anyone. 2-ER-437, 443; Rosenzweig Decl., Dkt. 16-2 ¶¶ 14-18; Burkholder Decl., Dkt. 16-3 ¶¶ 11-22. This Court stayed the reprocessing order pending appeal. Dkt. 21.

## SUMMARY OF ARGUMENT

**I.** ERISA allows plan members to challenge the wrongful denial of benefits,

under allegedly improper guidelines, by bringing a claim for "benefits due" under their plans. 29 U.S.C. § 1132(a)(1)(B). But proving a "benefits due" claim requires more than a "facial" critique of guidelines used to make coverage decisions. It requires each plaintiff to show that the challenged aspects of the guidelines *caused* the defendant to wrongfully deny benefits, and that the plaintiff would be entitled to benefits if they met the requirements of appropriate guidelines.

Plaintiffs' deliberate decision *not* to address those requirements at trial—because they would have precluded class certification—should have defeated their claims. By nonetheless certifying a classwide "facial challenge" to UBH's guidelines and ordering UBH to reprocess 67,000 coverage determinations without requiring a causal link between the challenged aspects of the guidelines and any denial of benefits due, the district court contravened Article III, ERISA, Rule 23, and the Rules Enabling Act.

Article III requires more than a bare *procedural* injury to Plaintiffs' supposed right to fair adjudication. Plaintiffs' standing depends on the denial of their coverage requests. Without any causal link to those denials, Plaintiffs lack standing to challenge the guidelines, and their "benefits due" claim fails under ERISA. Nor do ERISA's other remedial provisions—*e.g.*, a claim to "enforce" or "clarify" plan-conferred rights under Section 1132(a)(1)(B), or an equitable claim under Section 1132(a)(3)—eliminate this causation requirement. These remedies address other

21

circumstances—not past benefit denials—and in any event require proof of causation. Rule 23 and the Rules Enabling Act also barred the district court from relaxing these requirements to facilitate class treatment.

**II.** On the merits, the court's finding of "pervasive" flaws in the guidelines was based on a reading of certain plan language concerning "generally accepted standards of care" that ignored myriad other plan requirements. It also reflected a misapplication of the required abuse-of-discretion standard. Instead of deferring to UBH's interpretations of the relevant health plans, as ERISA requires, the court rewrote the plans to require coverage consistent solely with generally accepted standards of care. The court also applied a preponderance-of-the-evidence standard to make findings about what standards are generally accepted. The court's skepticism—and thus its refusal to grant full deference to UBH—flowed from its erroneous belief that UBH had a conflict of interest and sought to protect its bottom line. Clear precedent establishes that administering *self-funded* plans, as UBH was doing for most class members, does not create a conflict of interest. And many plans *required* UBH to consider the cost-effectiveness of treatment. The court also ignored how UBH's clinicians apply the guidelines in practice. Reviewing the district court's rulings *de novo*, this Court should uphold UBH's guidelines.

**III.** The court independently erred by refusing to enforce plan terms requiring members to exhaust their administrative appeals before suing. The court misapplied

judge-made *prudential* exceptions to excuse compliance with the plans' *contractual* exhaustion requirement. Under Rule 23 and the Rules Enabling Act, class members cannot avoid complying with plan-imposed exhaustion requirements by joining with named Plaintiffs who exhausted. Nor can they claim exhaustion would have been futile, given these plan requirements and the court's acknowledgement that some members successfully appealed their coverage denials.

## STANDARD OF REVIEW

"'Where an ERISA Plan grants discretionary authority to determine eligibility for benefits or to construe the terms of the plan, a plan administrator's interpretation of a plan is reviewed for abuse of discretion.'" *Lehman v. Nelson*, 943 F.3d 891, 897 (9th Cir. 2019). "An ERISA administrator abuses its discretion only if it (1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly erroneous findings of fact." *Boyd v. Bert Bell/Pete Rozelle NFL Players Ret. Plan*, 410 F.3d 1173, 1178 (9th Cir. 2005). That standard "does not permit the overturning of a decision where there is substantial evidence to support the decision." *Snow*, 87 F.3d at 331-32.

This Court "review[s] the district court's conclusions of law de novo and its findings of fact for clear error." *Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989, 998 (9th Cir. 2020) (en banc). On appeal, the district court's application of the

abuse-of-discretion standard is a legal question that this Court reviews *de novo*. *Lehman*, 943 F.3d at 897. The Court generally "review[s] the district court's certification of a class action for abuse of discretion," but "review[s] the district court's rulings regarding standing *de novo*." *Ramirez*, 951 F.3d at 1022, 1033.

## ARGUMENT

## I.    The District Court Erred In Excusing Plaintiffs From Proving Causation

The court's central error was allowing Plaintiffs to advance a sprawling class claim in which no class member proved that the challenged conduct (alleged guideline flaws) caused actual injury (denial of benefits). Plaintiffs made only a facial attack on UBH's guidelines, without showing that the guidelines (let alone the specific aspects Plaintiffs challenged) caused the wrongful denial of benefits or resulted in concrete, particularized harm to anyone. The court acknowledged that "Plaintiffs' claims would fail for lack of causation" if they needed to show a causal link to denial of benefits, and Plaintiffs "stipulated that they d[id] not seek" to make that showing. 1-ER-77.

Plaintiffs' novel theory, underlying every major ruling in this case, is a transparent end-run around multiple foundational requirements. Both Article III and ERISA require causation, and Rule 23 and the Rules Enabling Act bar the court from relaxing that requirement to facilitate class treatment. While that problem infects all

24

the classes and relief awarded below, it is particularly acute with respect to the retrospective remedy of reprocessing. Correcting this error requires vacating the judgment and remanding with instructions to dismiss for lack of standing or, alternatively, reversing and remanding with instructions to decertify all classes and award judgment to UBH on all the named Plaintiffs' claims.[1]

## A.      Article III Required A Causal Link To Each Coverage Denial

Absent proof of causation, Plaintiffs' claims—especially those seeking reprocessing—cannot establish Article III standing. To establish standing, Plaintiffs must show:  (1) they suffered a "'concrete and particularized'" injury that is "'actual or imminent, not conjectural or hypothetical'"; (2) the injury is "fairly traceable to" misconduct by UBH; and (3) reprocessing would "redress" the injury. *Spokeo*, 136 S. Ct. at 1547-48. Plaintiffs must make these showings for "each member of [the] class." *Ramirez*, 951 F.3d at 1023.

The only "real harm" alleged is that UBH "den[ied] Plaintiffs' claims" for benefits. 1-ER-83. But Plaintiffs never attempted to show that this injury was "fairly traceable" to the alleged flaws in UBH's guidelines, *Spokeo*, 136 S. Ct. at 1547, because securing class certification required them to disclaim any showing of a

---

[1]   Although judgment against the class might be justified, *see Gene & Gene, LLC v. BioPay, LLC*, 624 F.3d 698, 703-05 (5th Cir. 2010), the remedy that is most fair to UBH and absent class members alike is to decertify the class and enter judgment in UBH's favor against the named Plaintiffs.

causal link to benefits denials, 1-ER-77. Instead, the court found standing based solely on an "intangible," "procedural" right to "fair adjudication" and the mere showing that some part of the guidelines was used in some way in making benefits determinations. 2-ER-332; 1-ER-82.

The court's holding cannot be squared with Supreme Court precedent. *Spokeo* holds that Plaintiffs "cannot satisfy the demands of Article III by alleging a bare procedural violation" that "may result in no harm." 136 S. Ct. at 15450. "Article III standing requires a concrete injury even in the context of a statutory violation." *Id.* at 1549. As this Court recognized on remand from the Supreme Court, "even when a statute has allegedly been violated, Article III requires such violation to have caused some real—as opposed to purely legal—harm to the plaintiff." *Robins v. Spokeo*, 867 F.3d 1108, 1112 (9th Cir. 2017).

Applying these principles to ERISA, *Thole* rejected the assertion that plan members' "legally protected interest in having [a] fiduciary obligation fulfilled" constitutes a concrete injury under Article III. Pet. Br. 20, 2019 WL 4447276. The Court held that plaintiffs' fiduciary-duty claim "failed to … allege a concrete injury" because—like many class members here—"[w]inning or losing this suit would not change" their benefits payments. 140 S. Ct. at 1621-22. "There is no ERISA exception to Article III," and Congress's codification of fiduciary duties does not eliminate the need for a concrete injury. *Id*. As in *Thole*, Plaintiffs here assert an abstract

26

fiduciary breach without any causal link to denial of benefits and have no concrete interest in having UBH reprocess their request for coverage apart from the possibility that they may receive benefits.

UBH raised *Thole* twice, but the district court did not address it. 2-ER-399-401, 447. The court held only that the alleged ERISA violations "implicate a 'risk of real harm'" because UBH clinicians "used" the challenged guidelines, among other documents, in deciding coverage requests. 1-ER-83. But showing the guidelines were "used" simply recasts the alleged breach as the injury—akin to the *Thole* plaintiffs arguing that improper investments violated their right to proper investment. Article III requires a more "particularized" injury caused by the alleged violation that is not "'conjectural or hypothetical.'" *Spokeo*, 136 S. Ct. at 1548. The "particular procedural violations alleged" must "entail a *degree* of risk sufficient to meet the concreteness requirement." *Id.* at 1550 (emphasis added). And *Spokeo* sets a "high standard" for the "magnitude of the risk" required. *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 927-28 (11th Cir. 2020) (en banc).

Plaintiffs fell far short of that "high standard." All that unified the 67,000 claims is that the denial letters cited one of more than 200 LOCGs or CDGs. That bare fact is insufficient without the causal link Plaintiffs elected not to pursue or prove.

Indeed, several additional disparities within the classes exacerbated the problem:

*First*, for many denials, UBH never even applied the particular guidelines Plaintiffs challenged. The trial addressed two sets of guidelines—the LOCGs and the Custodial Care CDGs. But **51%** of the denial letters in a stipulated sample cited only a third set of guidelines—UBH's Diagnosis-Specific CDGs—that Plaintiffs challenged "only to the extent that they incorporate" the separate LOCGs. 2-ER-250; 2-ER-405-406.[2] The court found that the guidelines in this third category all "incorporated" the challenged LOCGs because they each mention or allude to the LOCGs—for example, by stating that UBH "maintains clinical protocols that describe the scientific evidence, prevailing medical standards and clinical guidelines supporting our determinations." 1-ER-217. But Plaintiffs offered no evidence, and the court never found, that the Diagnosis-Specific CDGs themselves were flawed, or that the LOCGs were even considered in connection with these requests for coverage.

Indeed, at least 18% of the sample denials rested exclusively on parts of the unchallenged CDGs that did not mention or even refer generally to any challenged guidelines. 2-ER-405-406. These claims—of which there are thousands—rest on

---

[2]  The parties stipulated to try this case based on a sample of members' denial letters, 96 of which remain in the classes today. 2-ER-337; 2-ER-405; 15-ER-3074-3079.

the thinnest of reeds: a denial letter mentioning a CDG, which in turn mentions an LOCG, which Plaintiffs challenged only *in part*. For these thousands of claims, there is simply no connection between Plaintiffs' guideline challenges and the benefits denial.

*Second*, many denials were independently supported by grounds other than the challenged guidelines, thereby precluding ERISA liability on these claims *See Snow*, 87 F.3d at 332-33 (administrator's decision must be upheld if there is "evidence in the record to support" it). A few examples from the stipulated sample are illustrative:

- Member 6355 was denied coverage *both* because the requested treatment was inconsistent with the LOCGs, *and* because his plan explicitly excluded coverage for *investigational* or *unproven* services. 15-ER-3082; 13-ER-2735.

- Member 1060's *own provider* believed the residential treatment she sought was not medically necessary. 15-ER-3066.

- Member 12102 could be safely treated in an outpatient setting, but sought continued residential treatment because he was homeless and *would like to be housed somewhere*, which was insufficient under his plan terms. 15-ER-3072-3073.

- Member 6326 was offered coverage for standard, weekly 45-minute

therapy sessions because he presented no basis for the non-standard, *extended-length* 60-minute session he requested. 15-ER-3068-3070. These class members, and many others, have no concrete interest in reprocessing because their coverage was independently foreclosed for reasons having nothing to do with the challenged guidelines.

*Third*, many class members would gain nothing from reprocessing because they never received or sought reimbursement for their initial coverage requests. UBH used the challenged guidelines to adjudicate preauthorization requests or concurrent review for future or continued treatment. 13-ER-2730; 7-ER-1401:14-21. When UBH denied these requests, it typically offered coverage at another level of care. 7-ER-1401:22-1402:18; 9-ER-1835:13-21. Many members accepted this alternative care and, thus, never incurred compensable damages because they never received and paid for the treatment for which they were denied coverage. *E.g.*, 15-ER-3058-3059 (member accepted outpatient treatment after being denied coverage for residential treatment and discharged); 15-ER-3060 (member accepted once-weekly therapy sessions after UBH denied twice-weekly coverage).

This is no small point. For up to 65% of the parties' agreed-upon random sample, the class members never sought reimbursement for the requested services, so there is no evidence they ultimately received (or incurred any costs for) those

30

services.[3]  The remedies order nevertheless would require these class members to be contacted, and even if there is no evidence that the member ever received the services—and thus could not receive any benefits payment from a reprocessing— UBH *still is required to reprocess their authorization requests*.  1-ER-135-136, 181-182.

For most class members, the judgment entered would yield nothing more than an out-of-the-blue letter asking them to search for documentation about years-old behavioral health conditions and treatment, along with a subsequent "reprocessing" that could not possibly result in additional benefits—all to rectify a supposed harm to "fair adjudication."  2-ER-332.  This empty and counterproductive exercise cannot be reconciled with Article III.  The judgment should be vacated and the case remanded with instructions to dismiss Plaintiffs' claims for lack of standing.

## B.  ERISA Section 1132 Required Proof Of Causation

Plaintiffs' ERISA claims "require proof that the alleged ERISA violation caused harm."  *Huntsinger v. Shaw Grp., Inc.*, 268 F. App'x 518, 520 (9th Cir. 2008).  There is a universal presumption that a "statutory cause of action is limited to plaintiffs whose injuries are proximately caused by violations of the statute."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014).  ERISA

---

[3]  Over 36% never had any claim for payment submitted for any treatment at the level of care for which they were denied.  2-ER-425-429.  28% more had no claim for payment involving the same provider.  2-ER-429-430.

31

authorizes no relief for Plaintiffs' alleged violations of a procedural right to fair adjudication divorced from any causal link to a benefits denial.

### 1. Plaintiffs Failed To Show A Causal Link To "Benefits Due" Under Section 1132(a)(1)(B)

Under ERISA, the remedy for denial of benefits lies in a claim for "benefits due … under the terms of [the] plan." 29 U.S.C. § 1132(a)(1)(B). Such claims "require proof that the alleged ERISA violation caused harm." *Huntsinger*, 268 F. App'x at 520. Indeed, an administrator such as UBH must "cause improper denial of benefits" to be a "proper defendan[t] under [Section] 1132(a)(1)(B)" in the first place. *Spinedex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.*, 770 F.3d 1282, 1297 (9th Cir. 2014). Showing that "benefits were *wrongfully* denied" requires establishing a "causal link between an alleged breach and a denial of benefits." *Romberio v. UnumProvident Corp.*, 385 F. App'x 423, 429 (6th Cir. 2009).

Plaintiffs eschewed this requirement by arguing that they sought "reprocessing" of their coverage determinations instead of benefits. 1-ER-71. The court agreed, 1-ER-79-80, citing *Saffle v. Sierra Pacific Power Co.*, which "remanded" an individual ERISA claim to a claims administrator. 85 F.3d 455, 460-61 (9th Cir. 1996). But nothing in *Saffle* allows a court to order remand—for reprocessing or anything else—without first assuring itself of liability (including causation).

When plans give claims administrators "discretionary authority" to interpret plan terms—as ERISA permits, *Conkright*, 559 U.S. at 512, and all plans did here,

2-ER-253—courts respect that discretion in two ways. First, in considering liability, they review administrators' decisions "deferential[ly]." *Glenn*, 554 U.S. at 111. Second, in considering the member's right to benefits, they may "remand" so that the administrator can decide an issue "in the first instance." *Saffle*, 85 F.3d at 460. But remand is not an end in itself. It is instead a step in determining "whether [the plaintiff] is *entitled* to benefits" under Section 1132(a)(1)(B). *Williamson v. UNUM Life Ins. Co.*, 160 F.3d 1247, 1251 (9th Cir. 1998) (emphasis added). The purpose is to respect the administrator's plan-conferred discretion.

The district court turned these rules upside down by treating the availability of remand as a reason to lessen the members' burden in proving liability. Review of a claims administrator's discretionary determinations is "*more* 'deferential'" than the *de novo* standard that applies in the absence of discretion—not less. *Renfro v. Funky Door Long Term Disability Plan*, 686 F.3d 1044, 1048 (9th Cir. 2012) (emphasis added). If there is "evidence in the record to support the [administrator's] decision," the decision must be upheld, and remand is inappropriate. *Snow*, 87 F.3d at 332-33. Before remanding in *Saffle*, for example, this Court determined that the coverage denial was actually wrongful *and* that the claimant would be "entitled to the benefits for which she applied" if the specific questions that required remand were resolved in her favor. 85 F.3d at 456-60.

Plaintiffs cited *no* prior case in which *any* court has ordered reprocessing without making these findings. Indeed, Plaintiffs proclaimed that "[n]o other lawyer ha[s] ever brought" this kind of classwide facial challenge, 2-ER-392, circumventing the "multitude" of concededly "individualized inquiries" that an (a)(1)(B) claim entails, 1-ER-65-66. Rather, this Court and others have ordered such a remand only upon proof that: (1) an error in claims processing *caused* the claims administrator to improperly deny a claim for benefits; and (2) allowing the claim administrator to decide a specific, dispositive issue is necessary to preserve the administrator's discretion under the plan.

Again, *Saffle* proves the point. The claims administrator there denied an individual claim for total disability benefits "based on" an impermissible interpretation of "totally disabled," with no other ground for denial. 85 F.3d at 456, 459. The Court remanded because the benefits were denied "based on" or "premised on" the error identified by the court, not some other lawful ground. *E.g.*, *Pannebecker v. Liberty Life Assurance Co.*, 542 F.3d 1213, 1221 (9th Cir. 2008). Otherwise the error is immaterial to whether "benefits" are "due," 29 U.S.C. § 1132(a)(1)(B), and remand does not advance an (a)(1)(B) claim.

For any denials "based on" or supported by multiple independent grounds (like many denials at issue here), the court must determine that *each* of those grounds was flawed before it can order remand. *E.g.*, *Vizcaino v. Microsoft Corp.*, 120 F.3d

1006, 1009, 1013 (9th Cir. 1997) (en banc) (remanding only after finding "legal erro[r]" in *both* of the independent grounds that denial was "based upon"). If only "one of" the claims administrator's "two independent reasons for denying … benefits" is flawed, the error is merely "procedural" and "[does] not render arbitrary and capricious the … other reason" or "require a substantive remedy" of remand that would ultimately prove "useless" because the result would still be denial of benefits. *McCartha v. Nat'l City Corp.*, 419 F.3d 437, 446-47 (6th Cir. 2005). "[R]emand is inappropriate" where "no factual determinations remain to be made" and "'reevaluation of the merits of [the] claim' is not required," *Canseco v. Constr. Laborers Pension Tr.*, 93 F.3d 600, 609 (9th Cir. 1996), whether because the record unambiguously requires benefits, as in *Canseco*, or because it independently supports denying them, as in *McCartha* and so many class members' claims here.

The district court worried that a causation requirement would "involv[e] the Court in just the sort of inquiry that [*Saffle*] cautioned … should be left to the administrator." 1-ER-80. But a court's role in reviewing the record to determine the basis for the denial—and ensuring that the above requirements are satisfied—is distinct from a claims administrator's role in applying a corrected standard to the underlying facts. *Saffle* did not "le[ave]" causation "to the administrator"; it specifically found that the plaintiff's claim was denied "based on" the error challenged. 85 F.3d at 459. Indeed, the administrator conceded that it denied benefits "on the

ground[s]" of the precise interpretation that the plaintiff challenged. *Id.* at 458. And the district court also found that after correcting the error, the claimant *was* entitled to benefits. *Id*. at 456. This Court reversed so that the administrator, rather than the district court, could "'apply the correct standard'" in the first instance, but no one disputed that the plaintiff *would* be due benefits *if* found to satisfy that standard. *Id.* at 459-61. Nothing in *Saffle* or any case supports remand absent these facts showing a causal connection between the alleged error and denial of benefits.

### 2. ERISA's Other Remedy Provisions Cannot Save Plaintiffs' Claims

Plaintiffs cannot circumvent the requirements for benefits claims by repackaging them as fiduciary breach claims under 29 U.S.C. § 1132(a)(3), or claims to "enforce" or "clarify" their plan-conferred rights under § 1132(a)(1)(B). Even under those theories, moreover, Plaintiffs must still establish a causal link to the alleged breach.

**a.** Section 1132(a)(3) allows members to seek "appropriate equitable relief" for certain ERISA violations. It is a "'catchall' provisio[n]" for "injuries caused by violations that [Section 1132] does not elsewhere adequately remedy." *Varity*, 516 U.S. at 512. But Section 1132(a)(1)(B) *already* "specifically provides a remedy for breaches of fiduciary duty with respect to the interpretation of plan documents and the payment of claims." *Id*. If the fiduciary abuses its discretion in denying the claim, the claimant can challenge the denial and seek the benefits due.

36

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). *Saffle*, for example, was an (a)(1)(B) claim. *See* Appellant's Br. 2, 1999 WL 33749317. Courts thus distinguish between fiduciary breaches "with respect to the interpretation of plan documents and the payment of claims," which are actionable under (a)(1)(B), and "breaches of other sorts of fiduciary obligations," for which (a)(3) provides relief, *Varity*, 516 U.S. at 512. Because Section 1132(a)(1)(B) "afford[s] adequate relief" where the alleged breach of fiduciary duty actually affects benefits, a claimant "may not bring a claim for denial of benefits under [Section] 1132(a)(3)." *Castillo*, 970 F.3d at 1229.

Moreover, reprocessing is not "appropriate equitable relief" under 29 U.S.C. § 1132(a)(3). "Almost invariably suits seeking" to "compel the defendant to pay a sum of money to the plaintiff are suits for money damages—the classic form of *legal* relief.'" *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 661 (9th Cir. 2019) (alteration omitted). As the Supreme Court held in *Great-West*, Section 1132(a)(3) "does not authorize" a claim for "an injunction to compel the payment of money past due under a contract, or specific performance of a past due monetary obligation." 534 U.S. at 210-11, 221. Here, since remand for reprocessing is admittedly a step in "determin[ing] whether [Plaintiffs are] entitled to … benefits," *Saffle*, 85 F.3d at 457—a monetary payment—their claim is legal, not equitable, and Section 1132(a)(3) does not apply. Under settled law, a "denial-of-benefits claim" cannot

be "recharacterize[d] … as a claim for breach of fiduciary duty" without more. *Castillo*, 970 F.3d at 1231.

Accordingly, multiple courts have held that requests for reprocessing "do not constitute 'equitable relief['] under [Section 1132](a)(3) because they amount to no more than backdoor ways to obtain benefits due under the plans." *Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*, 2016 WL 6601662, at *11 (C.D. Cal. Feb. 3, 2016). A reprocessing claim "is essentially a request for an injunction to enforce a contractual obligation to pay money past due" and "is precisely what the Supreme Court disallowed under [Section] 1132(a)(3)" in *Great-West*. *Chorosevic v. MetLife Choices*, 2009 WL 723357, at *11 (E.D. Mo. Mar. 17, 2009).

Even if Section 1132(a)(3) otherwise applied here, "[a] causal connection between the alleged breach and the alleged harm" is still "a necessary element of an ERISA-participant's breach-of-fiduciary-duty claim." *Romberio*, 385 F. App'x at 429; *cf. Thole*, 140 S. Ct. at 1622 (same under Article III). When the plan member is "not entitled to the benefits in the first place," Section 1132(a)(3) does not provide relief because there can be "no causal link between the alleged breach of fiduciary duty … and the denial of benefits." *Hein v. FDIC*, 88 F.3d 210, 224 (3d Cir. 1996); *accord Sedlack v. Braswell Servs. Grp., Inc.*, 134 F.3d 219, 225 (4th Cir. 1998). "Even if [the defendant] breaches its fiduciary duty," therefore, "a plan participant may not sue for that breach" without "establishing that these practices *caused* any of

38

his claims to be denied." *Ryan S. v. UnitedHealth Grp., Inc.*, 2020 WL 6723443, at *4-5 (C.D. Cal. Aug. 14, 2020).

The district court's contrary holding that Plaintiffs may seek relief "'even in the absence of actual injury,'" 1-ER-78, rested on distinguishable cases. *Shaver v. Operating Engineers* addressed *prospective equitable relief* to prevent "future misconduct" by plan fiduciaries. 332 F.3d 1198, 1203 (9th Cir. 2003). *Ziegler v. CIGNA* addressed ERISA's statute of limitations—*when* a claim accrues for an impending injury, not whether an injury is required. 916 F.2d 548, 551-52 (9th Cir. 1990). Neither decision remotely suggests that a plan member can seek *retrospective* relief under Section 1132(a)(3) divorced from any past injury. And any such holding would not have survived *Thole*, as courts have found. *See*, *e.g.*, *Anderson v. Intel Corp.*, 2021 WL 229235, at *14 (N.D. Cal. Jan. 21, 2021).

**b.** Plaintiffs likewise cannot sidestep the requirements of a "benefits due" claim by invoking other clauses of Section 1132(a)(1)(B). 1-ER-73. In addition to seeking "benefits due," Section 1132(a)(1)(B) allows a claim to "enforce … rights," or "clarify … future benefits," "under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). These claims allow current members "to enjoin the plan administrator from improperly refusing to pay benefits" and "to obtain a declaratory judgment" that they are "entitled to benefits under the provisions of the plan." *Russell*, 473 U.S. at 147. Plaintiffs seek neither.

Plaintiffs never sought to "enforc[e]" any "plan ter[m]" beyond the right to payment of "benefits due." That remedy "gives a claimant only [an] action 'to enforce his rights *under the terms of the plan*.'" *Cox v. Keystone Carbon Co.*, 894 F.2d 647, 650 (3d Cir. 1990). But the abstract right to fair adjudication untethered from payment of benefits due is not one spelled out in the plan. Instead, the plan terms Plaintiffs invoked merely help *define* those benefits by excluding coverage for claims inconsistent with "generally accepted standards of care." 2-ER-253.

Nor does reprocessing "clarif[y]" Plaintiffs' rights to "*future* benefits" (the third clause of Section 1132(a)(1)(B)). As Plaintiffs conceded, reprocessing is "*retrospective*" relief addressing *past* benefits. 1-ER-102; *see also* 1-ER-172, 174 (distinguishing reprocessing from "the prospective injunctive relief" separately ordered).

**c.** At a minimum, constitutional avoidance principles require that ERISA's remedial provisions not be read so broadly that "there would be serious constitutional doubt whether [a] plaintiff could demonstrate [Article III] standing." *Gollust v. Mendell*, 501 U.S. 115, 125 (1991). Given *Lexmark*'s presumption that federal statutes require causation and the serious Article III concerns with eliminating that requirement, no provision of ERISA can be read to authorize Plaintiffs' claims.

### C. Rule 23 And The Rules Enabling Act Forbid Excusing Causation To Facilitate Class Actions

The Rules Enabling Act, 28 U.S.C. § 2072(b), "underscores" the flaws in Plaintiffs' novel reprocessing theory. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 845 (1999). The Act "forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011).

That is exactly what happened here. Plaintiffs invented a new substantive theory—previously known to "[n]o other lawyer," 2-ER-392—to facilitate class certification. They cited no case in which any court awarded reprocessing based on allegations about a claims administrator's policies without also reviewing, as this Court did in *Saffle*, the member's administrative record to link the policy causally to the benefits denial. It would make no sense to seek, let alone award, such relief in an individual action unless the challenged policy caused the denial of benefits. Plaintiffs' novel theory makes sense *only* as an attempt to certify a class of highly individual benefits claims.

This is not debatable. Plaintiffs jettisoned causation because they (and the court) recognized they could not meet that requirement through classwide proof. The court correctly noted that if showing causation were required, it would involve "a multitude of individualized circumstances" precluding class certification. 1-ER-193. "Absent a showing that the benefits were *wrongfully* denied"—which "depends on a number of factors peculiar to the claimant's case"—"there can be no causal link

between an alleged breach and a denial of benefits; and whether a claim for benefits is *wrongfully* denied depends on a number of factors peculiar to the claimant's case." *Graddy v. BlueCross BlueShield*, 2010 WL 670081, at *8 (E.D. Tenn. Feb. 19, 2010).

Many courts have thus recognized that facial challenges to claims administrators' policies are ill-suited to class certification because they fail to meet Rule 23(a)(2)-(3)'s commonality and typicality requirements, and the predominance requirement, which applies here because the court awarded reprocessing under Rule 23(b)(3), 1-ER-135. *Graddy*, 2010 WL 670081, at *9-10; *Dennis F. v. Aetna Life Ins.*, 2013 WL 5377144, at *1, 3 n.4 (N.D. Cal. Sept. 25, 2013); *Pecere v. Empire Blue Cross & Blue Shield*, 194 F.R.D. 66, 67, 71 (E.D.N.Y. 2000). Under this rule, "the court must 'ensure that the class is not defined so broadly as to include a great number of members who … could not have been harmed,'" which is the case here. *Castillo v. BOA*, 980 F.3d 723, 730 (9th Cir. 2020).

Plaintiffs' invocation of the "facial" label as a talisman to avoid individualized issues of causation is itself a red flag. *E.g.*, 2-ER-451. Facial challenges originated in constitutional law, where they remain "disfavored" because they "often rest on speculation." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450-51 (2008). Instead, "Art[icle] III limits on the jurisdiction of federal courts to actual cases and controversies" generally require plaintiffs to litigate their own specific circumstances. *New York v. Ferber*, 458 U.S. 747, 767 n.20 (1982). Even

where permitted, a facial challenge is "the most difficult" to make because plaintiffs must show that "no set of circumstances exists" under which the challenged provision could be validly applied. *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see*, *e.g.*, *Wells Fargo Bank, N.A. v. Mahogany Meadows Ave. Tr.*, 979 F.3d 1209, 1217 (9th Cir. 2020).

The trial below presented precisely the type of "speculat[ive]" controversy about abstract challenges to UBH's guidelines, disembodied from any particular application, that courts warn against. *Wash. State Grange*, 552 U.S. at 450. Far from rising to their "heavy burden" of establishing that the guidelines could never be validly applied to anyone—the hallmark of facial challenges, *Salerno*, 481 U.S. at 745—Plaintiffs abused the facial label to *lessen* their burden and showed, at most, that the guidelines might be misapplied to the detriment of some. Indeed, the court repeatedly rejected UBH's efforts to demonstrate how the guidelines were validly applied in practice. *Infra*, at 57-59. That abuse of a superficially "efficient" "technique" is exactly why the Supreme Court discourages facial challenges. *Sabri v. United States*, 541 U.S. 600, 608-09 (2004).

## II.     The District Court Usurped UBH's Authority To Set Guidelines And Interpret Plan Terms

The district court independently committed reversible error on the merits in holding that UBH "abuse[d]" its "discretion" and "breached its fiduciary duty" by promulgating the guidelines and applying them to the class. 2-ER-332-334. That

ruling—which this Court reviews "de novo," *Lehman*, 943 F.3d at 897—reflects no misconduct by UBH, but a series of fundamental legal errors that led the court unilaterally to usurp UBH's discretionary authority, rewrite the underlying plans, and impose its preferred medical standards on UBH and the plans it administers for an astounding *twenty-year period* from 2011 to late 2030. Those errors cannot be squared with UBH's broad discretionary authority under the plans.

It is undisputed that "[a]ll of the class members' health benefit plans grant discretion to UBH, as [a] claims administrator, to interpret plan terms, limitations and exclusions in determining whether a requested service is covered." 2-ER-253. UBH's discretion includes authority to develop guidelines to assist its medical directors and other personnel, and to "make factual determinations relating to benefits." *E.g.*, 12-ER-2622. ERISA requires courts to respect administrators' discretion in order to avoid litigation-driven take-overs of plan administration. *Conkright*, 559 U.S. at 515-19. ERISA thus provides for review of UBH's determinations under a "deferential" "abuse-of-discretion" standard. *Glenn*, 554 U.S. at 110-11.

The district court deprived UBH of that deference at every turn. The court invented an independent requirement that UBH's guidelines provide for "coverage consistent with generally accepted standards of care," 2-ER-368, and ignored plan provisions limiting coverage *even if* treatment satisfied generally accepted standards. The court then selected new guidelines based on its own assessment of "generally

44

accepted standards," 2-ER-261-270; 1-ER-104, and judged UBH's guidelines on paper—ignoring their application in practice—by how well they parroted the standards the court chose, 2-ER-270-325. The whole structure of the class trial worked to circumvent the proper standard of review—which "does not permit the overturning of a decision where there is substantial evidence to support" it, *Snow*, 87 F.3d at 331-32—because the court permitted Plaintiffs' purely "facial" challenge to the guidelines, and ultimately set aside of tens of thousands of decisions on this basis. The court then ordered a reprocessing of past requests *and* a ten-year injunction, effectively imposing Plaintiffs' preferred guidelines on UBH (and the thousands of plans it administers) for a twenty-year period. 1-ER-132-148, 186-189.

### A.  The Court Erred By Rewriting The Plans To Require Coverage Consistent With Generally Accepted Standards

The court's errors began with misreading the plans. When an administrator has "discretion to interpret the Plan, the only question is whether [the administrator's] interpretation … was unreasonable." *Day v. AT&T Disability Income Plan*, 698 F.3d 1091, 1098 (9th Cir. 2012). Under the abuse-of-discretion standard, UBH's interpretation "will not be disturbed if reasonable." *Firestone*, 489 U.S. at 111.

The court failed to abide by these rules. To avoid variations in plan language that would (and should) have precluded class certification, *e.g.*, *Lipstein v. UnitedHealth Grp.*, 296 F.R.D. 279, 282-83, 86 (D.N.J. 2013); *In re WellPoint, Inc. Out-Of-*

*Network "UCR" Rates Litig.*, 2014 WL 6888549, at *1 (C.D. Cal. Sept. 3, 2014), Plaintiffs reduced the case to a single phrase: "generally accepted standards of care," 2-ER-253. The court accepted Plaintiffs' position that each plan "require[d] coverage consistent with generally accepted standards of care" and did not "permit [UBH] to adopt rules that are inconsistent with those standards." 2-ER-365-368. That interpretation reflects multiple errors.

*First*, none of the plans "require[d] coverage consistent with generally accepted standards of care." 2-ER-368. ERISA neither requires plans to cover all services consistent with generally accepted standards nor sets any minimum coverage requirements at all. *See Black & Decker*, 538 U.S. at 833. And no plan purported to cover all such services. Instead, they either *excluded*—as one of many plan exclusions—services "[n]ot consistent with generally accepted standards," or defined covered services as services that, *among other requirements*, are consistent with generally accepted standards. *E.g.*, 12-ER-2634-2635 (emphasis added); *see* 2-ER-253. By requiring UBH to conform its guidelines to cover all services consistent with generally accepted standards, the court transformed a *limit* on coverage into a dispositive *expansion* of coverage.

*Second*, the court erroneously ignored plan provisions limiting coverage "even if the treatment would otherwise be consistent with generally accepted standards of care." 7-ER-1330:13-15. For example:

- The court found that some of UBH's guidelines overemphasized treatment of "acute symptoms" and "stabilizing crises." 2-ER-270. But many plans expressly limited coverage to such "short-term" interventions, *e.g.*, 13-ER-2771, 2846-2847, or allowed treatment only "to stabilize the presenting problem," 13-ER-2841.

- The court found that UBH's guidelines improperly factored in the cost of treatment. 2-ER-331. But many plans expressly "required" UBH to consider cost-effectiveness of treatment, 7-ER-1312:7-1313:19, by limiting coverage to "the least costly alternative" that is "medically appropriate," *e.g.*, 13-ER-2767, or excluding coverage for treatment that does not "result in outcomes demonstrably better" than "less intensive or most cost effective" alternatives, 12-ER-2640-2641.

- The court found that UBH's guidelines improperly excluded coverage of "clinically managed" treatment—*i.e.*, treatment not provided or supervised by medical professionals such as doctors. 2-ER-308-310. But as the court acknowledged, many plans expressly "do not cover treatment at this level of care because they require that treatment be provided by medical professionals," 2-ER-310; *accord* 1-ER-169—for example, by requiring the "active participation and direction of a physician," 12-ER-2631-2632.

47

- Both the guidelines and the plans exclude "custodial care." 2-ER-297. The court found that the guidelines "broadened" this term "beyond [its] generally accepted definition." *Id.* But many plans defined the term separately and without linking it to "generally accepted standards." 13-ER-2789-2827; 7-ER-1349:18-1350:14. As the court acknowledged, many plans used *the same definition* of custodial care as the disputed guidelines, which could "limit coverage … to exclude even some services that are consistent with generally accepted standards." 2-ER-305; *compare* 13-ER-2789, 2798, *with* 12-ER-2518; *see also* 7-ER-1353:10-20.

The court held these plan provisions were irrelevant because they did not inform the "meaning" of "generally accepted standards." 1-ER-202. But courts must enforce plan terms *as written*, and nothing in these plans required UBH to make benefits decisions based solely on generally accepted standards.

Indeed, the CDGs were expressly designed to "assis[t] in interpreting" UBH's plans as a whole—not just generally accepted standards. *E.g.*, 12-ER-2555-2556, 2572, 2583, 2612. Each CDG specifies the set of plans to which it applies (referencing specific "templates" used for multiple plans) and states that: (1) "the enrollee specific document must be referenced" before applying the CDG; and (2) the CDG does not apply where inconsistent with plan terms. *Id.* The exclusion of services inconsistent with generally accepted standards is only *one* of the plan terms reflected

48

in the CDGs, 4-ER-752:19-21, so they did not need to track generally accepted standards exclusively to conform to the plan as a whole.

*Third*, many plans expressly referenced UBH's guidelines—which were published and available to sponsors and members—and authorized UBH to apply them. *E.g.*, 12-ER-2624-2625, 2643. When UBH agreed to provide administrative services for these plans (and when members enrolled in them), therefore, an element of the bargain was that UBH would apply its guidelines. 7-ER-1298:24-1299:3, 1301:9-1303:17, 1324:3-1325:14, 1333:15-17. Many plans contain separate exclusions for treatment inconsistent not just with generally accepted medical standards, 2-ER-253, but also with UBH's own guidelines. *E.g.*, 13-ER-2847 (excluding services which are not "consistent with [UBH's] level of care guidelines"). These plans contemplate that UBH's guidelines may go beyond generally accepted standards, since otherwise the separate guidelines exclusion would be "rendered nugatory," contrary to accepted rules of plan interpretation. *Richardson v. Pension Plan of Bethlehem Steel Corp.*, 112 F.3d 982, 985 (9th Cir. 1997).

Neither Plaintiffs nor the court ever pointed to any plan language requiring UBH's guidelines to make coverage decisions based *solely* on generally accepted medical standards. Instead, the court wrongly placed the burden on *UBH* to "poin[t] to [something] in [the] plan[s]" that affirmatively authorized guidelines not tied to

49

such standards.  2-ER-367.  As just explained, myriad plan provisions permitted denial of coverage even for treatment consistent with "generally accepted" standards of care.  In any event, the court's analysis was backwards.  Under the abuse-of-discretion standard, it was *Plaintiffs'* burden to point to something in the plans making UBH's interpretation of the guideline exclusions *un*reasonable.  *Conkright*, 559 U.S. at 512.  An interpretation that gives the "guidelines" exclusion meaning distinct from the separate "generally accepted standards" exclusion is *at least* reasonable.

The court's singular focus on "generally accepted standards," both as a common question for class certification and as a basis for liability, was error.  The guidelines' reasonable implementation of the governing plans warrants decertification and judgment in UBH's favor.  *See supra*, at 25 & n.1.

### B.  The Court Applied The Wrong Standard Of Review To UBH's Clinical Judgments About Generally Accepted Standards

The district court also denied UBH the deference due to its clinical judgments by applying a "preponderance of the evidence" standard to decide what "standards are generally accepted."  2-ER-261.

Assessing medical standards is a "factual determinatio[n] relating to benefits," and falls within the broad clinical discretion that the plans give to UBH, *e.g.*, 12-ER-2622, as well as its discretion to promulgate guidelines, 2-ER-253.  Under ERISA's abuse-of-discretion standard, courts review an "administrator's factual determina-

50

tions" for "clear error" and uphold them "where there is substantial evidence to support the decision." *Snow*, 87 F.3d at 332-33. But the district court did not apply "clear error" or "substantial evidence." Instead, it made its own "find[ings], by a preponderance of the evidence," as to which medical "standards are generally accepted." 2-ER-261.

The two standards of review are incompatible. "'[S]ubstantial evidence means more than a mere scintilla but *less than a preponderance*.'" *Chu v. CFTC*, 823 F.3d 1245, 1250 (9th Cir. 2016) (emphasis added). The court "review[s] the administrative record" and decides whether "reasonable mind[s] might accept [the evidence in it] as adequate." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "The abuse of discretion standard permits the district court to review only the evidence presented to the plan trustees." *Winters v. Costco Wholesale Corp.*, 49 F.3d 550, 553 (9th Cir. 1995). UBH—not the court—is the factfinder and is "responsible for determining credibility, resolving conflicts in medical testimony," and "resolving ambiguities." *Andrews*, 53 F.3d at 1039. "[E]ven decisions directly contrary to evidence in the record do not necessarily amount to an abuse of discretion." *Boyd*, 410 F.3d at 1178. "[A] single persuasive medical opinion supporting the administrator's decision can be sufficient to affirm." *Williby v. Aetna Life Ins. Co.*, 867 F.3d 1129, 1138 (9th Cir. 2017).

Substantial-evidence review is thus no occasion for the battle of experts that

the court resolved through hundreds of paragraphs of preponderance-of-the-evidence-driven judicial factfinding about what standards the court believed were generally accepted. Indeed, those "findings" carry no weight on appeal because review of the district court's application of the abuse-of-discretion standard is "de novo." *Lehman*, 943 F.3d at 897.

Under the proper standard, UBH did not abuse its discretion because substantial evidence supported UBH's guidelines. At trial, the parties' experts identified more than a dozen resources that inform generally accepted standards. 8-ER-1607:6-12; 9-ER-1831:21-1832:1, 1833:24-1834:19; 10-ER-2033:25-2034:2. No source alone is definitive, 8-ER-1607:6-16, and there are many ways to draft guidelines consistent with generally accepted standards, 7-ER-1412:3-9. Indeed, "authors of local coverage determinations" for the Medicare program "don't always agree" on those standards. 4-ER-874:12-14. Under ERISA, too, it is well-established that "reasonable," medically-trained minds "can disagree," so UBH "cannot be characterized as acting arbitrarily for disagreeing with a plaintiff" on these issues. *Webb v. Hartford Fin. Servs. Grp., Inc.*, 608 F. Supp. 2d 1218, 1227 (C.D. Cal. 2009).

UBH revised its guidelines annually and took great care to align them with generally accepted standards. Uncontroverted evidence showed that UBH solicited hundreds of comments from approximately 40 internal medical directors and clini-

cians, more than 50 external clinicians, and numerous professional societies—including the very organizations whose guidelines UBH has now been ordered to apply. 12-ER-2656-2676, 2695; 13-ER-2699-2720; 7-ER-1391:22-1392:8; 10-ER-2160:23-2161:1, 2184:12-20. UBH regularly asked these commenters whether any "criteria … should be added or deleted" from the LOCGs. *E.g.*, 12-ER-2695. UBH acted on these suggestions from external groups, sometimes making changes even when its internal staff disagreed. 7-ER-1460:15-1462:14. UBH also published its guidelines on the Internet, *e.g.*, 12-ER-2643, so anyone could submit complaints or comments on them.

Many comments validated the guidelines. Commenters described various years' guidelines as "[w]ell written, detailed, comprehensive," 12-ER-2681, "clear, comprehensive and well thought out," 13-ER-2699, and said they "should be praised," 13-ER-2719; *accord* 12-ER-2659 ("I have reviewed the guidelines and cannot find anything at all to recommend!"). Even some practitioners who initially offered negative feedback later acknowledged the guidelines' suitability. *Compare* 12-ER-2663 (discussing criticisms of 2014 guidelines), *with* 10-ER-2163:16-2164:8 (discussing same commenter's description of later guidelines as "clear, exhaustive, and seem[ing] to offer adequate support for making decisions"); 12-ER-2681 (same

commenter finding 2016 guidelines "clear, well written and organized," "more complete and better thought out than many such documents," and "offer[ing] adequate support for making decisions about care").

Commenters specifically validated many aspects of the guidelines that the district court rejected. For example, the court found UBH excessively "focus[ed] on moving members to lower levels of care once their acute symptoms have been addressed." 2-ER-286 (emphasis omitted). But the American Psychological Association advised UBH to add language to its guidelines listing "stabilizing individuals and transitioning them to a less intensive level of care" as a goal of treatment. 13-ER-2700, 2704. None of Plaintiffs' experts—on whose testimony the court relied to make its findings—raised any concerns with the guidelines until they surfaced as testifying experts in this litigation. *But see Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 970 (9th Cir. 2006) (en banc) ("in general, a district court may review only the administrative record when considering whether the plan administrator abused its discretion").

The court's misapplication of a preponderance-of-the-evidence standard was error. Properly applying ERISA's substantial evidence standard warrants judgment in UBH's favor.

### C. The Court Erred In Holding That UBH Had A Conflict Of Interest In Administering Self-Funded Plans

The district court further undercut UBH's discretion by viewing UBH's guidelines with "significant skepticism" because it concluded that UBH had a "structural conflict of interest." 2-ER-330-332. But most plans at issue were self-funded by large employers, 2-ER-319, meaning UBH did not bear the cost of paying benefits under those plans, 2-ER-252. Under settled precedent, no conflict exists and no skepticism is warranted under these plans.

A "conflict of interest" may exist when the *same entity* "both determines whether an employee is eligible for benefits and pays benefits out of its own pocket." *Glenn*, 554 U.S. at 108. Even then, courts must "continu[e] to apply a deferential [(abuse-of-discretion)] standard of review," but the conflict may "act as a tiebreaker when the other factors are closely balanced." *Id.* at 115-17.

By contrast, this Court has consistently held that claims administrators of self-funded ERISA plans have no conflict of interest because they do not bear the costs of paying claims. *E.g.*, *Willlby*, 867 F.3d at 1138; *Day*, 698 F.3d at 1096; *Scoles v. Intel Corp. Long Term Disability Benefit Plan*, 657 F. App'x 667, 668 (9th Cir. 2016); *Castillo v. Cigna Healthcare*, 11 F. App'x 945, 950 (9th Cir. 2001). Other circuits likewise recognize that third-party administrators of self-funded ERISA health plans have "'no conflict of interest'" because they "'incu[r] no immediate expense as a result of paying benefits." *Pierce v. Wyndham Worldwide Operations,*

*Inc.*, 791 F. App'x 45, 51 (11th Cir. 2019); *accord*, *e.g.*, *Barron v. Blue Cross Blue Shield of Michigan*, 534 F. App'x 344, 345-46 (6th Cir. 2013).

The district court relied on UBH's supposed "incentive to keep benefit costs down for [self-funded] customers." 2-ER-319. But a claims administrator's "'financial interest in pleasing'" its customers "is too remote to establish a conflict of interest." *Pierce*, 791 F. App'x at 51. Otherwise, *every* third-party administrator would have a conflict of interest, *contra Williby*, 867 F.3d at 1138, and administrators could never mitigate their conflicts, rendering this Court's ordinary framework for abuse-of-discretion review a dead letter and casting all ERISA administration under a cloud of suspicion, *Morris v. Am. Elec. Power Long-Term Disability Plan*, 399 F. App'x 978, 983 (6th Cir. 2010).

The district court also focused on the fact that UBH tracked projected benefit expense, 2-ER-319, and described the guidelines as a way to "'ensure appropriate utilization,'" 2-ER-321. But "guard[ing] the assets of the [Plan] from improper claims" was *part* of UBH's fiduciary duty—not evidence of a conflict. *Boyd*, 410 F.3d at 1178. And many plans required UBH to consider cost-effectiveness of treatments as compared to alternatives. *See* 7-ER-1312:7-1313:19, *e.g.*, 13-ER-2767; 12-ER-2640-2641.

The record shows that "financial considerations were rarely discussed" at committee meetings on developing the guidelines, and the lone finance department

representative on the committee "rarely attended or spoke." 2-ER-321 (citing 6-ER-1239:3-1241:9). Plaintiffs presented three instances, out of 180 meetings, in which the committee that approved the guidelines discussed benefit expense in any context. In two, consistent with plan requirements, UBH questioned whether to add coverage for specific treatments of questionable efficacy and cost-effectiveness. 2-ER-322-23. In the third, UBH declined to make a major overhaul of its guidelines without being able to "estimate [its] financial impact." 2-ER-324. Plaintiffs offered no evidence that UBH considered benefit expense in developing any of the guideline provisions that Plaintiffs challenged, or that such consideration would be improper. The court's skepticism was therefore unwarranted.

### D. The Court Ignored How UBH's Clinicians Apply The Guidelines In Practice

The court further erred—and disregarded ERISA's deferential standard of review—by focusing exclusively on a facial review of the guidelines' "language," while ignoring how they were applied in practice. 2-ER-242, 273, 283, 295. For example:

- The court held that UBH's "most troubling" deviation was its supposed "fail[ure] to adopt separate level-of-care criteria tailored to the unique needs of children and adolescents." 2-ER-296. However, UBH's guidelines direct UBH clinicians to take these unique factors into account; UBH trains its clinicians to address these factors; and as-applied evidence shows that UBH's

clinicians *actually* addressed these factors in making coverage determinations for children and adolescents. 9-ER-1832:16-22, 1841:22-1842:4, 1864:23-1867:25. Reviewers considered, for example, the member's age, history of trauma, living situation, family history, and relationship with peers. 9-ER-1864:23-1867:25; *e.g.*, 15-ER-3093-3094, 3109, 3121, 3126, 3129-3130.

- The court criticized the guidelines for not using the word "effectively" in discussing treatment of co-occurring conditions. 2-ER-283-284. But UBH's doctors testified they understood the guidelines (which contained multiple provisions addressing co-occurring conditions) required co-occurring conditions to be treated effectively. 7-ER-1426:2-21, 1485:3-20; 9-ER-1843:8-14. Plaintiffs offered no evidence that UBH *ever* denied a coverage request where co-occurring conditions could not be treated effectively at a lower level of care. Yet the court discounted UBH's testimony (calling it not "credible") based on the court's reading of the guidelines.

- The court applied the same formalistic approach in finding the diagnostic CDGs deficient based solely on the fact that they mentioned the challenged LOCGs—despite the lack of evidence that these references to the LOCGs had any effect on coverage. *See supra*, at 28-29.

The court thus reduced the case to a linguistic exercise—comparing the wording of UBH's guidelines to the standards selected by the court and interpreting them

as lawyers would—rather than considering how clinicians interpreted and applied them in practice. Given the deferential standard of review, the court should not have substituted its own hairsplitting interpretation for evidence of how UBH applied the guidelines in practice. Reviewing these rulings "de novo," *Lehman*, 943 F.3d at 897, this Court should reject Plaintiffs' facial challenge and enter judgment in UBH's favor.

## III. The District Court Erred By Excusing Absent Class Members From The Plan-Imposed Requirement To Exhaust Administrative Remedies

Finally, the court erred by refusing to enforce plan terms unambiguously requiring all plan members to exhaust their administrative remedies before filing suit. Certifying a class and granting reprocessing to class members who failed to satisfy this requirement violated ERISA, Rule 23, and the Rules Enabling Act, and is another independent reason why the classes here should be decertified.

UBH members generally have the right to appeal denials of coverage. 7-ER-1291:2-5. UBH's denial letters advise members of this right. 7-ER-1401:22-1402:6. The number and terms of these appeals vary by plan. 7-ER-1293:6-8.

Plan members must exhaust these remedies before enforcing their rights under ERISA. *Amato v. Bernard*, 618 F.2d 559, 566-67 (9th Cir. 1980). The exhaustion requirement is "a creature either of contract or judicial invention." *Conley v. Pitney Bowes*, 34 F.3d 714, 716 (8th Cir. 1994). Courts thus recognize both: (1) a contractual exhaustion requirement that may be imposed by "the plan document itself" as

"a precondition to any right of relief," *In re Household Int'l Tax Reduction Plan*, 441 F.3d 500, 502 (7th Cir. 2006); and (2) a judge-made, "prudential exhaustion requirement," *Castillo*, 970 F.3d at 1228, based on "sound policy" limiting litigation to disputes that already have been fully developed and crystallized through the appeals process, *see Amato*, 618 F.2d at 566-67.

It is undisputed that many class members—including at least 68% of the parties' agreed-upon sample—did not exhaust. *See* 13-ER-2829-2835. And the reasons for requiring exhaustion apply with full force here, given that a reprocessing would be pointless unless the claimant has fully developed the coverage request first. Yet the district court "excused" absent class members from exhaustion because: (1) each "named Plaintif[f] has exhausted administrative remedies"; and (2) exhaustion "would be futile." 2-ER-325. Both holdings lack merit.

**A.** This Court has never held that only the named plaintiffs must exhaust administrative remedies. And multiple courts have rejected that rule. *E.g.*, *Schmookler v. Empire Blue Cross & Blue Shield*, 107 F.3d 4 (2d Cir. 1997) (affirming dismissal of subclass who "have not exhausted their administrative remedies"); *Stephens v. U.S. Airways Grp., Inc.*, 2012 WL 13054263, at *3 (D.D.C. July 18, 2012) (denying class certification because only the named plaintiff satisfied exhaustion); *Churchill v. Cigna Corp.*, 2011 WL 3563489, at *7 (E.D. Pa. Aug. 12, 2011); *Coffin v. Bowater Inc.*, 228 F.R.D. 397, 404 (D. Me. 2005).

Excusing class members from exhausting their appeals not only ignores their plan terms; it also violates the Rules Enabling Act's prohibition against using Rule 23 to "abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b). Joining a class action cannot "abridge" UBH's contractual rights and defenses, or "enlarge" class members' rights, by reviving otherwise unavailable claims. Because "a class cannot be certified on the premise that [a defendant] will not be entitled to litigate its [valid] defenses to individual claims," *Dukes*, 564 U.S. at 367, the class cannot use certification to overcome exhaustion.

The district court relied on the Seventh Circuit's holding in *Household* that courts have "discretion" to waive the prudential exhaustion requirement where its "purposes" are satisfied because the named plaintiff has exhausted. 441 F.3d at 502. But that exception, even if it were valid, is limited to the judge-made *prudential* exhaustion doctrine. The Seventh Circuit expressly declined to "consider … the effect" if "a provision in the plan document itself requir[ed] exhaustion." *Id*. The district court's other authorities merely applied *Household* to prudential exhaustion—none raised contractual exhaustion. *See Des Roches v. Cal. Physicians' Serv.*, 320 F.R.D. 486, 500 (N.D. Cal. 2017) (citing *Leon v. Standard Ins. Co.*, 2016 WL 768908, at *4 (C.D. Cal. Jan. 28, 2016) (citing *Household*))); *Barnes v. AT&T Pension Benefit Plan-Nonbargained Program*, 270 F.R.D. 488, 494 (N.D. Cal. 2010) (citing *Household*)).

61

The "analysis [is] different" here because the plans required exhaustion "as a matter of contract." *Vaught v. Scottsdale Healthcare Corp. Health Plan*, 546 F.3d 620, 630, 632 n.4 (9th Cir. 2008). They state, for example, "You cannot bring any legal action against us to recover reimbursement until you have completed all the steps in the appeal process described [above]." 13-ER-2728; *accord*, *e.g.*, 13-ER-2754, 2765, 2782.

ERISA forecloses the extension of *Household*'s judge-made exception to an ERISA plan's contractual exhaustion requirement. "[A]pplying federal common law doctrines to alter ERISA plans is inappropriate where [plan] terms" are "clear and unambiguous." *Zurich Am. Ins. Co. v. O'Hara*, 604 F.3d 1232, 1237 n.4 (11th Cir. 2010). Excusing exhaustion under these plans would violate the well-settled principle that ERISA plans are "contract[s]" and courts must "enforc[e] plan terms as written." *Heimeshoff v. Hartford Life & Accident Ins. Co.*, 571 U.S. 99, 108 (2013). Courts thus regularly give effect to plan-imposed limits on judicial review, such as provisions granting administrators "discretion," *Glenn*, 554 U.S. at 111, or "contractual limitations provision" limiting the time to file suit, *Heimeshoff*, 571 U.S. at 108. Judge-made exceptions to these plan-imposed requirements—such as "tolling," *id.*, or a "prejudice" exception to plan-imposed limitations periods, *Upadhyay v. Aetna Life Ins. Co.*, 645 F. App'x 569, 571 (9th Cir. 2016)—violate ERISA. Exhaustion is no different.

62

**B.**     The court's "futility" exception fails for the same reason:  It is an "exceptio[n] to the *prudential* exhaustion doctrine," *Noren v. Jefferson Pilot Fin. Ins. Co.*, 378 F. App'x 696, 698 (9th Cir. 2010), and cannot override plan terms.

Even if the court could consider futility, it should not apply here.  Indeed, the court's remedies order undercut its earlier holding that exhaustion would have been futile.  When plan members appealed an initial denial, UBH overturned the initial denial 15%-20% of the time, meaning the members received all requested benefits.  9-ER-1960:15-1961:1.  The court thus acknowledged that "some class members' claim denials were overturned following an administrative appeal," 1-ER-195, and partially decertified the class to exclude those members based on "concern[s]" that ERISA did not permit them to sue after receiving all the benefits to which they were entitled, 1-ER-204-205.  Had other members appealed as their plans required, they may have received full benefits too, mooting their claims and removing them from the class.  Plaintiffs' "bare assertions of futility" are "insufficient" to show an appeal would have been "demonstrably doomed to fail."  *Diaz v. United Agric. Emp. Welfare Benefit Plan*, 50 F.3d 1478, 1485 (9th Cir. 1995).

## CONCLUSION

Over the forty-five years since ERISA was enacted, there have been thousands of decisions implementing its requirements and applying its enforcement provisions to disputed coverage decisions. But as Plaintiffs acknowledge, in all these years, "no other lawyer" won this type of facial challenge—not because these disputes never existed before this case, but because Plaintiffs' approach cannot be reconciled with Article III, ERISA, Rule 23, and the Rules Enabling Act.

In uncritically accommodating Plaintiffs' facial challenge to UBH's guidelines, the court committed multiple case-dispositive errors. It eliminated any requirement to show the challenged aspects of the guidelines caused class members to be denied benefits due under their plans; it ignored numerous plan terms other than those referring to "generally accepted" standards (including plan terms requiring exhaustion); and it blinded itself to evidence of how the guidelines were used in practice. In considering this challenge, the court improperly substituted its judgment for UBH's, rather than deferring to UBH's discretionary decisions as ERISA required.

UBH respectfully requests that the Court reverse or vacate the judgment and remand with instructions to dismiss the case for lack of standing or, alternatively, decertify the classes and enter judgment for UBH.

Dated: March 15, 2021            Respectfully submitted.

                                 */s/ Miguel A. Estrada*

Jennifer S. Romano                 Miguel A. Estrada
Andrew Holmer                     *Counsel of Record*
CROWELL & MORING LLP         Geoffrey M. Sigler
515 South Flower Street, 40th Floor  Lucas C. Townsend
Los Angeles, CA  90071        Matthew S. Rozen
(213) 622-4750                GIBSON, DUNN & CRUTCHER LLP
                                 1050 Connecticut Avenue, N.W.
April N. Ross                   Washington, D.C.  20036
CROWELL & MORING LLP         (202) 955-8500
1001 Pennsylvania Avenue, N.W.    MEstrada@gibsondunn.com
Washington, D.C.  20004
(202) 624-2500

*Attorneys for Defendant-Appellant United Behavioral Health*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 20-17363, 20-17364, 21-15193, 21-15194

I am the attorney or self-represented party.

**This brief contains** | 13,999 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

　　○ it is a joint brief submitted by separately represented parties;

　　○ a party or parties are filing a single brief in response to multiple briefs; or

　　○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [　　　].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Miguel A. Estrada | **Date** | Mar 15, 2021

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

**9th Cir. Case Number(s)** | 20-17363, 20-17364, 21-15193, 21-15194

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

Defendant-Appellant's Opening Brief

**Signature** | s/ Miguel A. Estrada     **Date** | Mar 15, 2021

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 15**     *Rev. 12/01/2018*

## ADDENDUM

Pursuant to Circuit Rule 28-2.7, this addendum includes the following pertinent statutory provisions and rules, reproduced verbatim:

**Exhibit A:**      28 U.S.C. § 2072

**Exhibit B:**      29 U.S.C. § 1132(a)(1)-(3)

**Exhibit C:**      Fed. R. Civ. P. 23(a)-(b)

# EXHIBIT A

**28 U.S.C. § 2072**

### § 2072.  Rules of procedure and evidence; power to prescribe

**(a)** The Supreme Court shall have the power to prescribe general rules of practice and procedure and rules of evidence for cases in the United States district courts (including proceedings before magistrate judges thereof) and courts of appeals.

**(b)** Such rules shall not abridge, enlarge or modify any substantive right.  All laws in conflict with such rules shall be of no further force or effect after such rules have taken effect.

**(c)** Such rules may define when a ruling of a district court is final for the purposes of appeal under section 1291 of this title.

# EXHIBIT B

## 29 U.S.C. § 1132(a)(1)-(3)

## § 1132. Civil enforcement

### (a) Persons empowered to bring a civil action

A civil action may be brought--

**(1)** by a participant or beneficiary--

    **(A)** for the relief provided for in subsection (c) of this section, or

    **(B)** to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

**(2)** by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title;

**(3)** by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan;

# EXHIBIT C

**Fed. R. Civ. P. 23(a)-(b)**

**Rule 23.  Class Actions**

(a) **Prerequisites.**  One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

 (1) the class is so numerous that joinder of all members is impracticable;

 (2) there are questions of law or fact common to the class;

 (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

 (4) the representative parties will fairly and adequately protect the interests of the class.

(b) **Types of Class Actions.**  A class action may be maintained if Rule 23(a) is satisfied and if:

 (1) prosecuting separate actions by or against individual class members would create a risk of:

  **(A)** inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

  **(B)** adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

 (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

 (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include:

  **(A)** the class members' interests in individually controlling the prosecution or defense of separate actions;

**(B)** the extent and nature of any litigation concerning the controversy already begun by or against class members;

**(C)** the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

**(D)** the likely difficulties in managing a class action.