**Nos. 20-17363, 20-17364, 21-15193, 21-15194**

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

DAVID AND NATASHA WIT, et al.,

*Plaintiffs-Appellees,*

v.

UNITED BEHAVIORAL HEALTH,

*Defendant-Appellant.*

GARY ALEXANDER, et al.,

*Plaintiffs-Appellees,*

v.

UNITED BEHAVIORAL HEALTH,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
Nos. 14-cv-2346-JCS, 14-cv-5337-JCS | Hon. Joseph C. Spero

## PLAINTIFFS-APPELLEES' PETITION FOR PANEL
## REHEARING AND REHEARING EN BANC

Peter K. Stris
Rachana A. Pathak
Dana Berkowitz
Colleen R. Smith
John Stokes
**STRIS & MAHER LLP**
777 S. Figueroa Street, Suite 3850
Los Angeles, CA 90017
(213) 995-6800

D. Brian Hufford
Jason S. Cowart
**ZUCKERMAN SPAEDER LLP**
485 Madison Avenue
10th Floor
New York, NY 10022
(212) 704-9600

*Attorneys for Plaintiffs-Appellees*
*[Additional Counsel on Following Page]*

Caroline E. Reynolds
David A. Reiser
**ZUCKERMAN SPAEDER LLP**
1800 M Street, N.W.
Suite 1000
Washington, DC 20036
(202) 778-1800

Adam Abelson
**ZUCKERMAN SPAEDER LLP**
100 East Pratt Street
Suite 2440
Baltimore, MD 21202
(410) 332-0444

Meiram Bendat
**PSYCH-APPEAL, INC.**
7 West Figueroa Street
Suite 300
PMB #300059
Santa Barbara, CA 93101
(310) 598-3690, x.101

*Attorneys for Plaintiffs-Appellees*

# TABLE OF CONTENTS

**Page**

Introduction and Rule 35(b) Statement ............................................................ 1

Grounds for Panel Rehearing and Rehearing En Banc ..................................... 3

    I.     Rehearing is required because the panel's reason for upholding UBH's Guidelines has no application to one of the three certified classes ............................................................................................... 3

    II.    Rehearing is required because the panel's decision undermines ERISA in ways that will have undeniable nationwide consequences .................................................................................. 7

         A.    The panel's decision allows UBH to substitute the judgment of its finance department for that of the medical community, despite clear plan language to the contrary ............... 7

         B.    Absent rehearing, the panel's decision will undermine patients' access to care nationwide ................................. 11

    III.   Rehearing is also required because the panel's disregard for UBH's overwhelming conflict of interest contravenes established Circuit and Supreme Court precedent ....................................... 13

Conclusion .................................................................................................... 17

Certificate of Compliance ............................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abatie v. Alta Health & Life Ins. Co.,*
  458 F.3d 955 (9th Cir. 2006) ................................................................ 14, 16, 17

*Curtiss-Wright Corp. v. Schoonejongen,*
  514 U.S. 73 (1995) ................................................................................ 10

*Metro. Life Ins. Co. v. Glenn,*
  554 U.S. 105 (2008) .............................................................................. 14, 16, 17

*Moyle v. Liberty Mut. Retirement Benefit Plan,*
  823 F.3d 948 (9th Cir. 2016) ............................................................... 10

*Saffon v. Wells Fargo & Co. Long Term Disability Plan,*
  522 F.3d 863 (9th Cir. 2008) ............................................................... 16, 17

**Statutes**

29 U.S.C. § 1022(a) ................................................................................. 10

29 U.S.C. § 1102(b)(3) ........................................................................... 10

29 U.S.C. § 1132(a)(1)(B) ...................................................................... 10

29 U.S.C. § 1144(b)(2)(A) ...................................................................... 6

**Regulations**

29 C.F.R. § 2520.102-3 ........................................................................... 10

29 C.F.R. § 2520.104b-3 ......................................................................... 10

## INTRODUCTION AND RULE 35(b) STATEMENT

In the battle against the nation's mental health and addiction crises, this case is an inflection point and a bellwether. Former Congressman Patrick J. Kennedy, sponsor of the federal mental health parity act, hailed it as the "*Brown v. Board of Education* for the mental health movement," while a major news outlet dubbed it "one of the most important and most thorough rulings ever issued against an insurance company."[1] As reflected in the response of industry watchers—and the amicus briefs that have been (and will be) filed by the U.S. government, multiple states, the American Psychiatric Association, American Medical Association, and others—it is no exaggeration to call this one of the most significant ERISA cases of the 21st century.

The issue is simple: when an insurer denies coverage as not "medically necessary," may it use guidelines inconsistent with the plan's requirement to use the medical community's generally accepted standards of care? Here, the panel said "yes," even though Defendant United Behavioral Health's ("UBH") Guidelines were not plan terms, were infected by an egregious conflict of interest, and were shown, in unchallenged factual findings, to be far stricter than the medical community's standards.

---

[1] Wayne Drash, *In scathing ruling, judge rips insurer for putting 'bottom line' over patients' health*, CNN (Mar. 6, 2019) https://www.cnn.com/2019/03/06/health/unitedhealthcare-ruling-mental-health-treatment/index.html.

Indeed, for one certified class (the "State Mandate Class"), state law expressly requires insurers to determine medical necessity under criteria promulgated by the medical community, and expressly forbids insurers from using any other criteria. The panel's decision literally does not mention the State Mandate Class. Yet, by reversing the judgment as to that class, it effectively nullifies these important state laws and, as several of these states will tell this Court as amici on rehearing, seriously affronts the states' interests in regulating insurance to protect their citizens.

The panel also gutted the well-established conflict of interest doctrine that is vital to protecting ERISA plan participants. Despite Supreme Court and Circuit precedent dictating otherwise, the panel disregarded the district court's factual findings that UBH's conflict of interest actually infected its Guidelines—which, the district court found, were shaped by UBH's finance department and designed to save itself money, not serve plan members. *E.g.*, 2-ER-331–32 (Findings of Fact and Conclusions of Law ("FFCL") ¶ 202) (unchallenged finding that finance department had "veto power" over Guidelines "and used it to prohibit even a change in the Guidelines that all of [UBH's] clinicians had recommended"). By refusing to strip UBH of deference under these circumstances, the panel gave insurers a roadmap for insulating from scrutiny decisions tainted by even egregious conflicts of interest.

The implications of the panel's decision are far-reaching. For one thing, the panel invalidated injunctive relief that protected the mental health and addiction coverage of *everyone* insured by UBH—millions of Americans across the country. And

the impact doesn't stop there. *Virtually every ERISA plan in the country*, often as a condition of state law, requires medical necessity decisions to follow the medical community's generally accepted standards of care. And *virtually every insurer* relies on guidelines separate from the plans to evaluate that question. *See* Assoc. for Behavioral Health and Wellness ("ABHW") Br. 1–2 (ECF No. 41) (amicus supporting *UBH* explaining that "guidelines are essential tools" for its member insurers, who collectively "provide coverage to over 200 million people"). By allowing the mental health subsidiary of the nation's largest insurer to use guidelines that are much stricter than the medical community's views, the panel's resolution of this test case will affect the coverage of mental health and addiction patients nationwide.

This case has garnered attention throughout the industry ever since the district court's landmark post-trial ruling in 2019. Its reversal—on grounds that effectively nullify state laws, ignore the district court's factual findings, and contravene Circuit and Supreme Court precedent—is a devastating setback in the fight against the nation's mental health and addiction crises that will only serve to embolden other insurers to follow UBH's lead. Rehearing is urgently needed.

**GROUNDS FOR PANEL REHEARING AND REHEARING EN BANC**

## I.    Rehearing is required because the panel's reason for upholding UBH's Guidelines has no application to one of the three certified classes

Rehearing is required to correct the panel's grievous error in omitting from its decision, and seemingly failing to consider at all, the "State Mandate Class" certified

by the district court. The ERISA plans of these class members are subject to state laws that require addiction treatment coverage decisions to be made using specified criteria promulgated by the medical community, and forbid the use of any other criteria (like UBH's Guidelines). The panel's opinion does not mention this class. Yet its rationale for reversing—that UBH had discretion *under the plans* to adopt and use its Guidelines—does not apply at all to the State Mandate Class. Rehearing is necessary to avoid nullifying these state laws and offending bedrock principles of federalism.

The district court certified three classes in this case: (1) the *Wit Guideline Class*, consisting of all members of ERISA health benefit plans whose requests for coverage of residential treatment services UBH denied based upon UBH's Guidelines; (2) the *Alexander Guideline Class*, consisting of members whose requests for coverage of outpatient or intensive outpatient services UBH denied based upon UBH's Guidelines; and (3) the *State Mandate Class*, consisting of all members of fully-insured ERISA health benefit plans governed by the state law of Connecticut, Illinois, Rhode Island, or Texas, whose requests for coverage of residential treatment services for a substance use disorder UBH denied based upon UBH's Guidelines, and not upon the state-mandated criteria. 2-ER-236–37 (FFCL ¶ 13) & 1-ER-214–15 (defining classes).

There are four states' laws implicated in the State Mandate Class: Connecticut, Illinois, Rhode Island, and Texas. The district court meticulously reviewed each state's law and concluded that they all required UBH to use specifically-prescribed criteria to determine the medical necessity of residential treatment for substance use disorders.

4

Connecticut, Illinois, and Rhode Island required UBH to use the American Society of Addiction Medicine ("ASAM") Criteria, or something equivalent. 2-ER-313–14 (FFCL ¶ 162) (Connecticut law "required insurers to use the ASAM Criteria, or a set of criteria that UBH 'demonstrates to the Insurance Department is consistent with' the ASAM Criteria"); 2-ER-310–13 (FFCL ¶¶ 157–61) (Illinois law "required that UBH use the ASAM Criteria rather than its own Guidelines"); 2-ER-314–15 (FFCL ¶¶ 163–64) (Rhode Island law required "guidelines [used] to make coverage determinations" to be "consistent with ASAM Criteria"). For Texas, UBH was required to apply criteria issued by the Texas Department of Insurance; Texas law did not allow for the use of different criteria, even if equivalent. 2-ER-315–16 (FFCL ¶¶ 165–67). UBH did not appeal the district court's legal determinations regarding the requirements of these states' laws.

The district court then made detailed factual findings, based partly on UBH's own admissions, that in denying the claims of each State Mandate Class member, (1) UBH applied its own Guidelines rather than the state-mandated criteria, and (2) UBH's Guidelines were not consistent with the ASAM Criteria. 2-ER-306–16 (FFCL ¶¶ 150–67). The court further found, as fact, that "UBH lied to state regulators" "[t]o conceal its misconduct." 1-ER-92 (Remedies Order at 1) (summarizing findings); 2-ER-308–09, -313–14 (FFCL ¶¶ 152–53, 162). UBH did not appeal any of these findings.

Finally, the district court concluded that UBH knowingly violated state law by applying its own Guidelines instead of the state-mandated criteria in evaluating medical necessity and that the State Mandate Class was entitled to relief. 2-ER-334 (FFCL ¶ 213); 1-ER-92, -179–80 (Remedies Order). UBH also did not appeal these conclusions.

Although UBH's challenges to Article III standing and class certification applied to all three Classes, UBH raised no challenge to the district court's ruling that UBH could not substitute its Guidelines for state-specified criteria. Nor did the panel identify any basis for reversing the district court's judgment as to the State Mandate Class. But the panel also did not exclude the State Mandate Class from its ruling.

The panel appears to have overlooked this class altogether. And the effect of this oversight is to allow UBH to use its restrictive Guidelines to deny coverage *even when state law mandates otherwise*. The panel's decision renders these state laws a dead letter and denies states the authority to decide for themselves how to protect their citizens by regulating insurance—a role ERISA expressly preserved for the states. 29 U.S.C. § 1144(b)(2)(A). Because the panel seemingly overlooked the State Mandate Class—effectively nullifying state laws and seriously offending principles of federalism—rehearing is needed.

## II. Rehearing is required because the panel's decision undermines ERISA in ways that will have undeniable nationwide consequences

As to the other two classes, the panel held that the plans could reasonably be interpreted as allowing UBH to apply its Guidelines over the medical community's standards. But the Guidelines are not terms of any plan in the class; the plans, rather, require medical necessity to be determined under "generally accepted standards of care," 2-ER-253–55 (FFCL ¶¶ 53-56), and the unchallenged factual findings showed that the Guidelines were inconsistent with those standards. Rehearing is necessary because the panel's resolution of this exceptionally important question will resonate nationwide, severely undermining access to mental health and addiction treatment across the country.

### A. The panel's decision allows UBH to substitute the judgment of its finance department for that of the medical community, despite clear plan language to the contrary

The panel's core error stems from UBH's fundamentally misleading argument about how health insurance plans work. UBH appears to have convinced the panel that, in finding UBH's Guidelines to be an unreasonable interpretation of generally accepted standards of care, the district court converted an *exclusion* for treatment *inconsistent* with generally accepted standards into an *affirmative mandate* for coverage of all services *consistent* with those standards. But that was not the basis for the district court's decision, and nobody thinks that is how the plans work. UBH's argument obfuscates what the Plaintiffs challenged and the district court found. *E.g.*, 2-ER-253

(FFCL ¶ 53). The result was a decision that allows UBH to ignore plan terms entirely when it makes coverage decisions using its own Guidelines.

1.     It was undisputed below that each plan in the class includes mental health and addiction treatment as "covered" services. *E.g.*, 12-ER-2624 ("Covered Services" include treatment for "Mental Illness [and] substance use disorders"); 2-ER-230 (FFCL ¶ 1). Those plan provisions mandate coverage for the listed services unless they are excluded or limited by another plan term. In one way or another, each plan *excludes* coverage for treatment that is inconsistent with the medical community's generally accepted standards of care. 2-ER-253 (FFCL ¶ 53) (unchallenged factual findings that every plan in the case includes a "requirement that the requested treatment must be consistent with generally accepted standards of care"); 12-ER-2624 (treatment must be "[c]onsistent with nationally recognized scientific evidence as available, and prevailing medical standards and clinical guidelines"); *see also* 2-SER-380–98 (chart excerpting relevant plan language). As a shorthand, UBH describes its application of this exclusion as a "medical necessity determination." Opening Br. 10 (ECF No. 25).[2]

Contrary to UBH's suggestions, this case is *entirely* about UBH's interpretation of that "medical necessity" exclusion, which is in every UBH-administered plan. 2-

---

[2] Some plans use "clinical appropriateness" or similar language rather than "medical necessity." *E.g.*, 12-ER-2634; *see* 2-SER-380–98 (plan language chart). For simplicity's sake, we use UBH's shorthand.

ER-253 (FFCL ¶ 53); *see also* 2-SER-380–98 (plan language chart). *That* is the plan term—the only one—that UBH was interpreting when it drafted the Guidelines, and that it was applying when it denied each class member's claim. 2-ER-247–48 (FFCL ¶ 39); 1-ER-221–22 (Further FFCL ¶ 223); 2-SER-302–03 (excerpt from UBH's description of its utilization review procedures). In other words, UBH denied every claim at issue on the ground that the services—which were covered as long as they were not subject to a plan exclusion—were excluded as not "medically necessary."

The problem, however, was that in making these medical necessity determinations, UBH substituted its own, highly-restrictive Guidelines for the standard required by the plans: generally accepted standards of care. *See* 2-ER-236–37 (FFCL ¶ 13) & 1-ER-214 (defining classes to include only denials based on the Guidelines); Opening Br. 10 (ECF No. 25) (UBH diagram showing Guidelines are used to make "medical necessity determinations"); 2-ER-230–31 (FFCL ¶ 3) (quoting representative claim denial stating "member's treatment does not meet the medical necessity criteria for residential mental health treatment per . . . Guidelines"); 2-ER-247–48 (FFCL ¶ 39) (purpose of UBH's Guidelines was "to establish criteria consistent with generally accepted standards for determining the appropriate level of care"). *That* substitution is the entirety of what the Plaintiffs challenged as to these classes. And the district court's findings, therefore, pertained to just that one plan term: the "medical necessity" exclusion.

**2.** If UBH had not obfuscated this key premise, the panel could never have let UBH swap its Guidelines for the medical community's standards. Mem. 7. The plans require this exclusion to be evaluated using "generally accepted standaards of care," not UBH's more-restrictive internal Guidelines. 2-ER-253. And neither *Moyle v. Liberty Mutual Retirement Benefit Plan*, 823 F.3d 948 (9th Cir. 2016), nor any other authority, permits an ERISA plan administrator to make coverage decisions inconsistent with plan terms. A grant of discretion to interpret a plan is not a delegation of authority to *amend* a plan by substituting internal guidelines that are inconsistent with the standards set forth in the plan. *See* 29 U.S.C. § 1102(b)(3); *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995).

Here, the district court found as fact (and the panel did not disagree) that UBH's Guidelines were not terms of any plan in the class, even plans that referenced the Guidelines in some way. 2-ER-253–55 (FFCL ¶¶ 55–56). ERISA requires that benefits be determined "under the terms of [the] plan," 29 U.S.C. § 1132(a)(1)(B)— not a separate set of criteria, never approved by a plan sponsor, that the insurer can change on a whim, without following any of ERISA's strict rules for amending a plan or providing notice to participants. *E.g.*, 29 U.S.C. § 1022(a); 29 C.F.R. § 2520.104b-3; 29 C.F.R. § 2520.102-3.

Since the Guidelines were not part of the plans, and the district court found them inconsistent with plan terms, UBH could not use them to deny coverage. The

panel's decision to the contrary is not only incorrect, but deals an enormous blow to mental health and addiction coverage nationwide.

### B. Absent rehearing, the panel's decision will undermine patients' access to care nationwide

The district court's decision in this case represented a nationally recognized step forward in the battle against mental illness and addiction. The panel's reversal is an equally significant step backwards. It will dramatically affect not only the millions of Americans *directly* covered by the relief the district court ordered, 1-ER-187 (barring UBH from using Guidelines across *all* ERISA-governed plans it administers), but also virtually every health plan and every insurer across the country. *E.g.*, APA and AMA Br. 6 (ECF No. 54) (explaining that insurers' reliance on guidelines that depart from generally accepted standards is "a pervasive problem affecting the quality and availability of care nationwide").

The direct impact on the millions insured by UBH, standing alone, warrants the en banc Court's attention. But this case promises enormous consequences far beyond UBH as well. One might reasonably ask why that is, given that an insurer's ability to use its own guidelines will depend on the terms of the individual plan and the state law that governs it. That fair question has a straightforward answer: there is almost complete uniformity across all health plans in the United States in tying medical necessity determinations to generally accepted standards of care.

As UBH's own amici explain, insurers almost always use standardized guidelines, which are separate from plan terms, to evaluate that key question. *See* ABHW Br. 1–2 (ECF No. 41) (explaining that "guidelines are essential tools" for its member insurers, who collectively "provide coverage to over 200 million people"). In other words, the panel's resolution of this case bears on virtually every ERISA health plan in the United States.

That is why this case has drawn such a wide array of high-profile amici on both sides. On the payor side, multiple nationwide trade associations, alongside the Chamber of Commerce, have beseeched this Court to understand how high the stakes are. ABHW Br. 4 (ECF No. 41) (court's findings will "impact[] the entire industry, not just UBH"); Chamber of Commerce Br. 4 (ECF No. 40) (describing "significant . . . impact" of district court's decision); Am. Health Ins. Plans Br. 4 (ECF No. 30) (describing "lasting . . . impact on ERISA-covered benefits plans").

The same is true on the patient care side, as told by amici that include the federal government, several states, the American Psychiatric Association, the American Medical Association, the medical associations of numerous states and localities, and over two-dozen other prominent mental health advocacy organizations. In the words of the American Psychiatric Association and the American Medical Association:

> These [insurer] guidelines "are supposed to reflect generally accepted standards of care," but the district court found that Defendant's guidelines departed from those standards in

> significant ways. In *amici*'s experience, such departures—and the resulting obstacles to appropriate treatment—are a pervasive problem affecting the quality and availability of care nationwide.

APA and AMA Br. 5–6 (ECF No. 54).

If the district court's decision reshaped the landscape, it is a certainty that the panel's decision will have an even greater impact, and it will not be a positive one. *E.g.*, California Br. 16 (ECF No. 56) ("Reversal of the district court's remedial order will undo these benefits to California residents and to the State."). It will put medical necessity determinations squarely in the purview of insurance companies' finance departments—even when plans require those decisions to be based on the medical community's standards. This presents real and serious risks to those who rely on mental health and addiction treatment. *E.g.*, *id.* at 15 ("[W]hen health plans or administrators impose barriers to mental healthcare, like UBH did here, patients are at a greater risk of unemployment, homelessness, substance abuse use, suicide, and incarceration, imposing financial and societal costs borne by the State and its residents."). Rehearing is warranted on this exceptionally important issue.

**III.  Rehearing is also required because the panel's disregard for UBH's overwhelming conflict of interest contravenes established Circuit and Supreme Court precedent**

Rehearing is also required because the panel disregarded Ninth Circuit and Supreme Court precedent regarding ERISA plan administrators' conflicts of interest. In assessing UBH's actions, the district court applied an abuse of discretion standard

with "significant skepticism" based on its findings that UBH had a deep conflict of interest that infected its coverage decisions by allowing money, rather than the best interests of participants, to drive the development of its Guidelines. 2-ER-331–32 (FFCL ¶ 202). The panel summarily disregarded the district court's factual findings, contravening *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105, 115 (2008), and this Court's en banc decision *Abatie v. Alta Health & Life Insurance Co.*, 458 F.3d 955, 965 (9th Cir. 2006). Instead, the panel suggested, relying on an incomplete quote from a different case, that there was "no evidence of malice, of self-dealing, or of a parsimonious claims-granting history" and therefore, even if it had considered UBH's conflict of interest, that conflict would not change its view. Mem. 7.

This holding improperly limits the types of conflicts that warrant stripping insurers of the deference typically afforded to their plan interpretations, and fails to give the district court's unchallenged factual findings the required weight. The resulting decision contravenes settled law and guts the conflict doctrine that is vital to fair adjudication of ERISA claims.

1.	The district court, in more than ten pages of factual findings supported by abundant evidence, laid out far more than the run-of-the-mill structural conflict that underlies every health benefit determination by an insurance company. Its findings conclusively established that UBH had a deep conflict of interest that actually infected its coverage decisions because it made cost savings the central tenet of its Guidelines. 2-ER-318–25, -329–32 (FFCL ¶¶ 174–89, 200–02).

Instead of insulating the development of its Guidelines from its financial self-interest—denying more claims means more money for itself—UBH embedded that self-interest into the Guidelines, thereby biasing every coverage determination made using those Guidelines. *Id.* UBH placed administrators from its Finance and Affordability Departments in key roles on the Guidelines committees and "provided detailed relevant financial briefings to other members of those committees" "on a monthly basis" so "the committee members were intimately familiar[] with the financial implications of their decisions in creating and revising the Guidelines." 2-ER-320–21, -331–32 (FFCL ¶¶ 180–82, 202). As a result, financial incentives tainted the entire Guideline development process, and the content of the Guidelines was ultimately designed to deny more claims and save money for UBH and its clients. *Id.*

Efforts to alter the Guidelines throughout the class period were also stymied by financial considerations. The record is replete with examples of UBH refusing to bring its Guidelines into line with generally accepted standards of care—despite consensus among the medical community and UBH's own clinicians that the Guidelines should be revised—solely because of the financial implications of the proposed changes. 2-ER-322–25 (FFCL ¶¶ 185–89). In the most extreme examples, UBH's Finance Department and CEO exercised their "veto power" to block Guideline changes that would affect UBH's bottom line. 2-ER-322, -324–25, -331–32 (FFCL ¶¶ 185, 189, 202).

15

**2.** Those findings, *none* of which UBH challenged on appeal, established a conflict of interest that "affected the benefits decision," *Glenn*, 554 U.S. at 117—precisely the type of conflict that requires heightened "skepticism" of an insurer's plan interpretation. *Abatie*, 458 F.3d at 968–69. "[W]here circumstances suggest a higher likelihood that [the conflict] affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration," the conflict should be considered "more important (perhaps of great importance)." *Glenn*, 554 U.S. at 117. The district court's findings of fact established both the severity of UBH's conflict and the actual impact it had on UBH's interpretation of the plans and development of the Guidelines (and thus the benefit decisions UBH made using those Guidelines). This Court, sitting en banc, has instructed that such findings must be treated as akin to "credibility determination[s]." *Abatie*, 458 F.3d at 969.

The panel, however, summarily disregarded the district court's skepticism and its findings regarding the conflict's *actual impact*, in direct contravention of *Abatie* and *Glenn*. The panel defied precedent by failing to treat the district court's findings the same as "credibility determinations." And the panel further erred by suggesting that the illustrative list of "malice," "self-dealing," and "a parsimonious claims-granting history" in *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 868 (9th Cir. 2008), was an exhaustive list of circumstances warranting skepticism. *Abatie* and its progeny make clear there are many ways insurance administrators' bias may impact

their decision-making, and courts should not restrict their review as the panel did here. If the district court's findings here don't establish the type of severe, corrupting conflict that justifies stripping a claims administrator of deference, then no case does.[3]

The implications of the panel's decision on this issue will also resonate far beyond UBH. As amici have told and will tell the Court, the practice of adopting coverage guidelines more restrictive than plan terms is not unique to UBH and is already pervasive throughout the industry. *See* § II.B, *supra*. With the panel's decision in hand, insurance administrators will now have no fear that their coverage decisions, let alone the guidelines on which they are based, will be closely scrutinized notwithstanding the self-dealing baked into them. Rehearing en banc is required to restore the critical protections prescribed by *Abatie* and *Glenn*.

## CONCLUSION

The district court's ruling was a landmark decision following nearly a decade of hard-fought litigation, and it had begun to turn the tide in the nation's fight against mental illness and addiction. If the panel's decision stands, that progress will be undone, and it is hard to imagine anyone mounting a comparable effort again.

---

[3] Even if the *Saffon* list were exclusive, however, the panel's memorandum would still violate *Abatie*, because the findings established that UBH's conflict did constitute "self-dealing" and resulted in a "parsimonious claims-granting history," *cf.* Mem. 7 (quoting *Saffon*). As the district court found, UBH embedded its financial self-interest into the Guidelines, *see* § III.1, *supra*, and in applying them to deny benefits, "significantly narrow[ed]" the "scope of coverage" under the class members' plans. *E.g.*, 2-ER-270 (FFCL ¶ 82).

Panel or en banc rehearing is desperately needed.

Dated: May 5, 2022                     Respectfully submitted,

                                         *s/ Peter K. Stris*
                                         Peter K. Stris
                                         Rachana A. Pathak
                                         Dana Berkowitz
                                         Colleen R. Smith
                                         John Stokes
                                         **STRIS & MAHER LLP**
                                         777 S. Figueroa Street, Suite 3850
                                         Los Angeles, CA 90017
                                         Telephone: (213) 995-6800
                                         pstris@stris.com
                                         rpathak@stris.com
                                         dberkowitz@stris.com
                                         csmith@stris.com
                                         jstokes@stris.com

                                         D. Brian Hufford
                                         Jason S. Cowart
                                         **ZUCKERMAN SPAEDER LLP**
                                         485 Madison Avenue, 10th Floor
                                         New York, NY 10022
                                         Telephone: (212) 704-9600
                                         Facsimile: (212) 704-4256
                                         dbhufford@zuckerman.com
                                         jcowart@zuckerman.com

                                         Caroline E. Reynolds
                                         David A. Reiser
                                         **ZUCKERMAN SPAEDER LLP**
                                         1800 M Street, N.W., Suite 1000
                                         Washington, DC 20036
                                         Telephone: (202) 778-1800
                                         Facsimile: (202) 822-8106
                                         creynolds@zuckerman.com
                                         dreiser@zuckerman.com

Adam Abelson
**ZUCKERMAN SPAEDER LLP**
100 East Pratt Street, Suite 2440
Baltimore, MD 21202
Telephone: (410) 332-0444
Facsimile: (410) 659-0436
aabelson@zuckerman.com

Meiram Bendat
**PSYCH-APPEAL, INC.**
7 West Figueroa Street
Suite 300
PMB #300059
Santa Barbara, CA 93101
Telephone: (310) 598-3690, x.101
Facsimile: (888) 975-1957
mbendat@psych-appeal.com

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 11. Certificate of Compliance for Petitions for Rehearing/Responses

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form11instructions.pdf*

**9th Cir. Case Number(s)** 20-17363, 20-17364, 21-15193, 21-15194

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 35-4 or 40-1, the attached petition for panel

rehearing/petition for rehearing en banc/response to petition is *(select one)*:

[x] Prepared in a format, typeface, and type style that complies with Fed. R. App. P.

32(a)(4)-(6) and **contains the following number of words:** 4,179**.**

*(Petitions and responses must not exceed 4,200 words)*

**OR**

[ ] In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** *s/ Peter K. Stris* **Date** May 5, 2022
*(use "*s/[typed name]*" to sign electronically-filed documents)*

---

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 11** *Rev. 12/01/21*