20-17363, 20-17364, 21-15193, 21-15194

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DAVID WIT, *et al.*,
    *Plaintiffs-Appellees*,
v.

UNITED BEHAVIORAL HEALTH,
    *Defendant-Appellant*,

GARY ALEXANDER, *et al.*,

    *Plaintiffs-Appellees*,
v.

UNITED BEHAVIORAL HEALTH,
    *Defendant-Appellant*.

**On Appeal from the United States District Court
for the Northern District of California**

Nos. 3:14-cv-2346, 3:14-cv-5337
Honorable Joseph C. Spero, Judge

**BRIEF OF THE STATE OF CALIFORNIA AS
AMICUS CURIAE IN SUPPORT OF
APPELLEES' PETITION FOR REHEARING AND SUGGESTION
FOR REHEARING EN BANC**

ROB BONTA
Attorney General of California
RENU R. GEORGE
Senior Assistant Attorney General
KARLI EISENBERG
Supervising Deputy Attorney General
ARI DYBNIS
MARTINE N. D'AGOSTINO
Deputy Attorney General
State Bar No. 256777
 1515 Clay Street, 20th Floor
 Oakland, CA 94612-0550
 Telephone: (510) 879-0292
 Email: Martine.DAgostino@doj.ca.gov

## TABLE OF CONTENTS

**Page**

Introduction and Interests of Amicus Curiae ................................................. 5
    I.    Access to Mental Healthcare in California is Inadequate ......... 7
    II.   Requiring Plans to Adhere to Generally Accepted Standards of Care Increases Access to Mental Healthcare ..... 11
    III.  Limiting Access to Mental Healthcare Harms California's Public Fisc ............................................................ 13
Conclusion ................................................................................................. 16

# TABLE OF AUTHORITIES

Page

**COURT RULES**

Federal Rule of Appellate Procedure 29(b)(2) ................................................. 3

9th Circuit Local Rule 29-2 .............................................................................. 3

**OTHER AUTHORITIES**

Behavioral Health Resources, UnitedHealthcare,
https://www.uhcprovider.com/en/resource-
library/behavioral-health-resources.html .................................................. 10

*2019 California Health Interview Survey*, UCLA Center for
Health Policy Research, 2019 ............................................................. 12, 13

California Senate Bill 855 California Legislation Regular
Session (Cal. 2020) ................................................................................... 13

Committee on the Consequences of Uninsurance, *Care Without
Coverage: Too Little, Too Late* 3-5, 11 (2002) ......................................... 8

Eran Ben-Porath, et al., *California Health Care Foundation,
Health Care Priorities and Experiences of California
Residents: Findings from the California Health Policy
Survey* 4 (2020) ......................................................................................... 6

Jocelyn Wiener, *Breakdown: California's Mental Health
System, Explained*, Cal Matters (April 30, 2019), / ................................. 4

Jocelyn Wiener, *'Go on Medi-Cal to Get That': Why
Californians with Mental Illness are Dropping Private
Insurance to Get Taxpayer-Funded Treatment*, Cal Matters
(July 31, 2020) ......................................................................................... 11

# TABLE OF AUTHORITIES
(continued)

**Page**

Katherine Wilson, *California Health Insurance Enrollment*,
California Health Care Found. (July 31, 2020) ...................................... 10

Liz Hamel, et al., *Kaiser Family Found. & Cal. Health Care Found.*, The Health Care Priorities and Experiences of California Residents 9 (2019) ............................................................... 1, 5

*Mental Health in California: Understanding Prevalence, System Connections, Service Delivery, and Funding* 70 (Cal. Budget and Policy Center ed., 2020) ....................................................... 11

*Mental Health in California*, Kaiser Family Found. ....................................... 2

*Mental Health and Substance Use*, Kaiser Family Found., (Feb. 10, 2021) ................................................................................................... 6

Kalair, et al., Policy Memo, *Medical Necessity Standards for Mental Health Parity in California*, 17 J. Sci. Pol. & Gov. 1, 2 (2020) ................................................................................................ 7, 8, 12

Rebecca J. Mitchell & Paul Bates, *Measuring Health-Related Productivity Loss*, 14(2) Popul. Health Manag. 93, 93 (2011) ................... 9

Sally H. Adams, et al., *Young Adult Anxiety or Depressive Symptoms and Mental Health Service Utilization During the COVID-19 Pandemic*, xx J. Adol. Health 1-4 (April 11, 2022) ................................................................................................... 6

Sara Rosenbaum, et al., *Substance Abuse and Mental Health Services Administration.* ............................................................................. 8

Steve Melek, *Addiction and Mental Health vs. Physical Health: Widening Disparities in Network Use and Provider Reimbursement 22* Millman Research Report, (Nov. 19, 2019) ................................................................................................... 9

# TABLE OF AUTHORITIES
## (continued)

Page

Wendy Holt, Cal. Health Care Found., *Mental Health in California: For Too Many, Care Not There* 4 (2018) ........................... 3, 5

Wendy Yi Xu, et al., *Cost-Sharing Disparities for Out-of-Network Care for Adults With Behavioral Health Conditions*, 2(11) JAMA Netw. Open. e1914554 (Nov. 6, 2019) ................................................................................................. 7

## INTRODUCTION AND INTERESTS OF AMICUS CURIAE

This case addresses whether ERISA-governed insurers may deny coverage of mental healthcare and substance abuse services based on guidelines that are inconsistent with generally accepted standards of care. Appellees seek rehearing on that "exceptionally important question," Pet. 7, and explain in the petition that the panel's decision threatens to "severely undermin[e] access to mental health and addiction treatment across the country," *id.* at 1.

The State of California submits this amicus brief in support of appellees to describe the importance of access to such services to residents in our State. Californians—like others across the nation—suffer from inadequate access to mental healthcare. One reason for the lack of access to such care is the denial of coverage for medically necessary treatment based on clinical guidelines that fall below generally accepted standards of care.

According to one study, two-thirds of surveyed Californians who sought mental health services believed that mental health treatment is unavailable for most

Californians.[1] Even before the global pandemic, the vast majority of adults with mild to moderate mental illness did not receive treatment.[2]

Inadequate access to mental healthcare imposes serious societal and financial consequences. When health plans and administrators erect barriers to mental healthcare, patients are at a greater risk of unemployment, homelessness, substance use disorder, suicide, and incarceration. These consequences have profound and sometimes irreparable effects on the individual patient and their family members.

Denial of coverage can also impose substantial financial burdens on the State—which often serves as a provider of last resort when private insurers do not provide coverage—when it is required to operate programs and distribute public funds that provide mental healthcare services for its residents. Thus, when health plans or their administrators limit healthcare access based on guidelines that are inconsistent with generally accepted standards of care, as UBH has done,

---

[1] Liz Hamel, et al., Kaiser Family Found. & Cal. Health Care Found., The Health Care Priorities and Experiences of California Residents 9 (2019), https://www.chcf.org/wp-content/uploads/2019/02/HealthCarePrioritiesExperiencesCaliforniaResidents.pdf.

[2] Mental Health in California, Kaiser Family Found., https://www.kff.org/statedata/mental-health-and-substance-use-state-fact-sheets/california/?utm_campaign=meetedgar&utm_medium=social&utm_source=meetedgar.com#:~:text=In%202017%2D2018%2C%205.2%25,5.6%25%20(13.8%20million (last visited May 11, 2022).

California's expenditures on mental healthcare inevitably increase.[3] Coverage decisions consistent with generally accepted standards of care, on the other hand, necessarily expand access to mental healthcare for plan members, including more than five million ERISA-governed plan members in California.

# ARGUMENT

## I. ACCESS TO MENTAL HEALTHCARE IN CALIFORNIA IS INADEQUATE

One out of six Californians experience some mental illness.[4] For one out of 24 Californians, their mental illness is so severe that it becomes difficult to function in daily life.[5] However, only one third of adults with mental illness reported receiving mental health treatment or counseling.[6]

Mental illness not only affects one's daily function but can shorten one's life. Those with serious mental illnesses live on average 10-25 years fewer than those

---

[3] California submits this amicus brief in support of Plaintiffs-Appellees pursuant to Federal Rule of Appellate Procedure 29(b)(2) and Ninth Circuit Local Rule 29-2.

[4] This data was collected in 2014. Wendy Holt, Cal. Health Care Found., Mental Health in California: For Too Many, Care Not There 4 (2018), https://www.chcf.org/wp-content/uploads/2018/03/MentalHealthCalifornia2018.pdf.

[5] *Id*.

[6] *Id.* at 15.

without.[7] This shortened life span is, in part, a result of a higher risk of suicide. For example, 4,300 Californians committed suicide in 2017, a 52% increase from the number in 2001.[8] The increase is more substantial for young Californians, as suicides for those aged 15 to 19 have increased 63% in that same time frame.[9]

Mental health treatment and substance use disorder treatment are viewed favorably by Californians, and the data show that more people would avail themselves of such care if they had access. About three-quarters of Californians surveyed say that counseling and medical treatment are very effective in helping people with mental health conditions lead healthy and productive lives, and a similar proportion agree with regard to substance use disorders.[10]

However, Californians (like others across the Nation) suffer a lack of access to mental healthcare. The majority of Californians surveyed in late 2018 agree that most people in the State suffering from mental health conditions are unable to

---

[7] Jocelyn Wiener, *Breakdown: California's Mental Health System, Explained*, Cal Matters (April 30, 2019), https://calmatters.org/explainers/breakdown-californias-mental-health-system-explained/.

[8] *Id.*

[9] *Id.*

[10] Liz Hamel, et al., Kaiser Family Found. & Cal. Health Care Found., The Health Care Priorities and Experiences of California Residents 10 (2019), https://www.chcf.org/wp-content/uploads/2019/02/HealthCarePrioritiesExperiencesCaliforniaResidents.pdf.

access the services they need.[11] Two thirds of surveyed respondents reported that they or a family member have actually sought mental health services but were unable to get them.[12] In California, it is estimated that 73.9% (2,130,000) of adults with mild mental illness, 68.5% (983,000) of adults with moderate mental illness, and 40.6% (507,000) of adults with serious mental illness did not receive mental health treatment in 2017-2018.[13] Among the adults in California who reported an unmet need for mental health treatment in the past year, 35.3% (550,000) did not receive care because of cost.[14] Before the COVID-19 pandemic, the top health issue Californians wanted the state government to address was ensuring access to mental health treatment.[15] And the need for mental health services has only increased during the COVID-19 pandemic.[16] About half of young adults surveyed

---

[11] *Id.* at 9.

[12] *Id.*; Holt, *supra* note 2, at 2.

[13] Kaiser Family Found., *supra* note 1.

[14] *Id*.

[15] Eran Ben-Porath, et al., California Health Care Foundation, Health Care Priorities and Experiences of California Residents: Findings from the California Health Policy Survey 4 (2020), https://www.chcf.org/wp-content/uploads/2020/02/HealthPolicySurvey2020.pdf.

[16] Nirmita Panchal, et al., *The Implications of COVID-19 for Mental Health and Substance Use*, Kaiser Family Foundation (Feb. 10, 2021), https://www.kff.org/coronavirus-covid-19/issue-brief/the-implications-of-covid-19-for-mental-health-and-substance-use/.

nationally in early 2021 reported mental health symptoms, and more than a third of those had unmet mental health treatment needs.[17]

Health plans often deny coverage for mental healthcare based on a purported lack of medical necessity. Many plan beneficiaries in California are thus forced to seek out-of-network care for mental healthcare. Californians are four to eight times more likely to go out-of-network for mental healthcare than physical health office visits.[18] And studies show that steeper out-of-pocket costs effectively limit patients' access to mental healthcare.[19] In short, access to affordable mental healthcare in California is insufficient to meet the needs of residents, and this problem is only exacerbated when health plans deny mental healthcare services to patients. When Californians are able to obtain care, it is frequently because they pay out-of-pocket—something that is out of reach for thousands of Californians.[20]

---

[17] Sally H. Adams, et al., *Young Adult Anxiety or Depressive Symptoms and Mental Health Service Utilization During the COVID-19 Pandemic*, xxx J. Adol. Health 1-4 (April 11, 2022), https://www.jahonline.org/action/showPdf?pii=S1054-139X%2822%2900344-5.

[18] Navita Kalair, et al., Policy Memo, *Medical Necessity Standards for Mental Health Parity in California*, 17 J. Sci. Pol. & Gov. 1, 2 (2020), https://www.sciencepolicyjournal.org/uploads/5/4/3/4/5434385/kalair_etal_jspg_v17.2.pdf.

[19] Wendy Yi Xu, et al., *Cost-Sharing Disparities for Out-of-Network Care for Adults With Behavioral Health Conditions*, 2(11) JAMA Netw. Open. e1914554 (Nov. 6, 2019), https://jamanetwork.com/journals/jamanetworkopen/article-abstract/2753980.

[20] *Id*.

## II. REQUIRING PLANS TO ADHERE TO GENERALLY ACCEPTED STANDARDS OF CARE INCREASES ACCESS TO MENTAL HEALTHCARE

When a behavioral health plan administrator like UBH evaluates coverage requests with clinical criteria that fall below generally accepted standards of care, there is risk that the requests will be denied for a purported lack of "medically necessity," even when the treatments, in the view of medical professionals, are actually medically necessary.[21] A health plan's use of clinical criteria that is inconsistent with generally accepted standards of care discourages clinicians from providing certain behavioral health treatments, and dissuades patients from seeking needed treatment, if the healthcare is not covered under their health plan.[22] But when clinical criteria conform to generally accepted standards of care, as the district court's orders required UBH to do, it leads to more approvals for medically

---

[21] *See* Appellants' Excerpts of Record (ER) 1 ER 270-310; *see also* Kalair, *supra* note 14 at 2. A 2003 report by the Substance Abuse and Mental Health Services Administration (SAMHSA) found that even where a proposed treatment is consistent with professional clinical standards, insurers use their medical necessity criteria to determine the proposed treatment is inconsistent with the insurer's interpretations of relative cost and efficiency and deny coverage. Sara Rosenbaum, et al., Substance Abuse and Mental Health Services Administration., https://hsrc.himmelfarb.gwu.edu/cgi/viewcontent.cgi?referer=https://www.google.com/&httpsredir=1&article=1170&context=sphhs_policy_facpubs.

[22] Studies show a positive correlation between coverage for mental health treatments and the receipt and provision of mental health treatments. Institute of Medicine (US) Committee on the Consequences of Uninsurance, Care Without Coverage: Too Little, Too Late 3-5, 11 (2002), https://www.ncbi.nlm.nih.gov/books/NBK220636/.

necessary treatment. More approvals of treatment, in turn, encourages clinicians to provide medically necessary treatment.[23] That can lead to substantially better outcomes for individuals with mental health and substance use disorders; evidence shows that increased use of behavioral healthcare improves the physical and mental wellbeing of those individuals.[24]

Requiring adherence to medically accepted standards of care can also aid both employers and employees. Employers rely upon administrators to utilize appropriate clinical criteria to ensure that their employees are actually receiving high quality health coverage.[25] And overly restrictive clinical criteria can hinder access to benefits that employers intended their employees to receive, and that the employees themselves anticipated receiving. Conforming to generally accepted standards of care avoids upsetting those expectations. And while the district court's orders directly implicated care for identified class members, all 700,000

---

[23] Kalair, *supra* note 14 at 2.

[24] Steve Melek, *Addiction and Mental Health vs. Physical Health: Widening Disparities in Network Use and Provider Reimbursement 22* (Nov. 19, 2019), Millman Research Report, https://assets.milliman.com/ektron/Addiction_and_mental_health_vs_physical_health_Widening_disparities_in_network_use_and_provider_reimbursement.pdf.

[25] Health-related work losses are estimated to cost US employers more than $260 billion each year, and may cost some companies more than direct medical expenditures. Rebecca J. Mitchell & Paul Bates, *Measuring Health-Related Productivity Loss*, 14(2) Popul. Health Manag. 93, 93 (2011), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3128441/?report=classic.

Californians who are members of an UBH administered plan no doubt stood to benefit from the reasoning of the decision.[26] As appellees observe, decisions requiring plans to cover treatment that is consistent with generally accepted standards of care undoubtedly influences other ERISA plans, thereby improving access for the millions of Californians in self-funded ERISA plans and policies that use a plan administrator.[27]

### III. LIMITING ACCESS TO MENTAL HEALTHCARE HARMS CALIFORNIA'S PUBLIC FISC

California expends substantial sums on the direct and indirect costs associated with mental healthcare and illness. Some of these costs include public funds expended on individuals with private insurance when the insurers deny medically necessary mental healthcare.

---

[26] This number represents the Californians in a self-insured ERISA health plan or policy that UnitedHealthcare administered in 2019. Katherine Wilson, *California Health Insurance Enrollment*, California Health Care Found. (July 31, 2020), https://www.chcf.org/publication/2020-edition-california-health-insurance-enrollment/. UBH manages behavioral health services for UnitedHealthcare's members. Behavioral Health Resources, UnitedHealthcare, https://www.uhcprovider.com/en/resource-library/behavioral-health-resources.html (last visited May 16, 2022).

[27] Even though SB 855 requires the use of guidelines consistent with generally accepted standards of care when plans and administrators make coverage determinations, the law's reach does not extend to the 5.6 million Californians in self-funded ERISA plans. Wilson, *supra* note 26.

The State spends more on mental health services than any other State. In 2017-2018, California spent $8.3 billion on direct mental health services, $2 billion less than New York, the State with the second highest mental health expenditures.[28]

California makes direct expenditures on residents with private insurance. Reports indicate that some California behavioral healthcare providers have directed patients with private insurance to public programs to access a broader range of mental health services because of limited behavioral health coverage.[29] Indeed, publicly-funded behavioral health facilities have reported that numerous patients with private insurance seek services at their facilities.[30]

Where behavioral healthcare is limited by coverage, patients often can only access care once symptoms have reached crisis levels, either at emergency centers or, in some instances, in state prisons, and at great cost to California's taxpayers.[31]

---

[28] Mental Health in California: Understanding Prevalence, System Connections, Service Delivery, and Funding 70 (Cal. Budget and Policy Center ed., 2020), https://calbudgetcenter.org/wp-content/uploads/2020/03/CA_Budget_Center_Mental_Health_CB2020.pdf.

[29] Jocelyn Wiener, *'Go on Medi-Cal to Get That': Why Californians with Mental Illness are Dropping Private Insurance to Get Taxpayer-Funded Treatment*, Cal Matters (July 31, 2020), https://calmatters.org/projects/california-mental-health-private-insurance-medi-cal/.

[30] *Id.*

[31] Kalair, *supra* note 14 at 2.

14

And when health plans or administrators impose barriers to mental healthcare, like UBH did here, patients are at a greater risk of unemployment, homelessness, substance abuse use, suicide, and incarceration, imposing financial and societal costs borne by the State and its residents.[32] But when the clinical criteria that health plans use to determine medical necessity conform to generally accepted standards of care, patients have greater access to care before their symptoms reach these crisis levels."[33]

Aside from these direct costs, untreated mental health and substance use disorders also impose indirect costs to California. For example, mental health disorders are associated with a reduction in productivity. In 2019, 20.2% of California adults reported that mental health problems caused a moderate or severe work impairment in the previous 12 months.[34] Specifically, 25% reported that they were unable to work 8-30 days in the last year because of mental health issues; 16.1% said they were unable to work between 31 days and 3 months; and 20.2%

---

[32] Policy & Politics in Nursing and Health Care 204 (Diana J. Mason et al., eds., 8th ed. 2021).

[33] Kalair, note 14 at 2.

[34] 2019 California Health Interview Survey, UCLA Center for Health Policy Research, https://ask.chis.ucla.edu (select and search "All of California," "Mental and Emotional Health," "Emotional Well-Being" and "Work Impairment Past 12 Months").

said they were unable to work for more than 3 months.[35] Additionally—apart from the immeasurable toll of loss of life—suicides impose an estimated $4.9 billion per year in direct and indirect costs on California.[36]

Greater access to mental healthcare to a significant number of Californians reduces the substantial financial burdens for the State. Moreover, greater access results in better mental health and greater productivity.

## CONCLUSION

The petition for rehearing and suggestion for rehearing en banc should be granted.

---

[35] 2019 California Health Interview Survey, UCLA Center for Health Policy Research, https://ask.chis.ucla.edu (select and search "All of California," "Mental and Emotional Health," "Emotional Well-Being" and "Number of Days Unable to Work Due to Mental Problems").

[36] Analysis of California Senate Bill 855 Health Coverage: Mental Health or Substance Abuse Disorders 20 (Cal. Health Benefits Review Program ed., 2020).

Dated: May 16, 2022               Respectfully submitted,

                                  ROB BONTA
                                  Attorney General of California
                                  RENU R. GEORGE
                                  Senior Assistant Attorney General
                                  KARLI EISENBERG
                                  Supervising Deputy Attorney General
                                  ARI DYBNIS
                                  Deputy Attorney General

                                  *s/ Martine N. D'Agostino*
                                  MARTINE N. D'AGOSTINO
                                  Deputy Attorney General

17

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 20-17363, 20-17364, 21-15193, 21-15194

I am the attorney or self-represented party.

**This brief contains** | 2,349 | **words**, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

⦿ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

  ○ it is a joint brief submitted by separately represented parties;

  ○ a party or parties are filing a single brief in response to multiple briefs; or

  ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Martine N. D'Agostino       **Date** | May 16, 2022
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**   *Rev. 12/01/2018*